335 So.2d 554 (1976)
STATE of Florida et al., Appellants,
v.
ALACHUA COUNTY, a Political Subdivision of the State of Florida, Appellee.
No. 49217.
Supreme Court of Florida.
July 15, 1976.
*555 Eugene T. Whitworth, State Atty., and William E. Whitley, Asst. State Atty., for appellants.
Norm La Coe, County Atty., and Daniel U. Livermore, Jr. of Freeman, Richardson, Watson, Slade, McCarthy & Kelly, Jacksonville, for appellee.
ROBERTS, Justice.
This cause is before us on direct appeal from a final judgment of the Circuit Court in and for Alachua County validating Special Obligation Bonds in the sum of not exceeding $2,801,884.80 and Public Improvement Bonds in the sum of not exceeding $1,773,220.80. We have jurisdiction pursuant to Article V, Section 3(b)(2), Florida Constitution, and Section 75.08, Florida Statutes.
Appellee, Alachua County, filed a complaint requesting the Circuit Court in and for Alachua County to validate Special Obligation Bonds not exceeding $3,000,000.00 and Public Improvement Revenue Bonds not exceeding $1,900,000.00. In the complaint, appellee alleged that authority was conferred upon it by the laws of this State, particularly Chapter 69-805, Laws of Florida, Special Acts, Section 125.01, Florida Statutes, and a home rule ordinance enacted December 16, 1975, to issue revenue obligations to finance the acquisition, construction, equipping and furnishing of County Capital Projects. The Special Obligation Resolution (Ordinance No. 77) provides that the Special Obligation Bonds shall be payable from and secured by a prior lien upon and a pledge of the County's Guaranteed Entitlement to Revenue Sharing Trust Funds as defined in and as payable to the County under Chapter 218, Part II, Florida Statutes, and in addition by a pledge of the County's non-ad valorem funds as defined in the Special Obligation Resolution. Said Resolution expressly provides that no ad valorem taxes shall be required to be levied for the payment of principal or interest on the Special Obligation Bonds and that neither the Special Obligation Bonds nor coupons shall constitute general obligation or indebtedness of Alachua County. The Public Improvement Resolution, Ordinance No. 78, provides that the Public Improvement Bonds shall be payable from and secured by a prior lien upon and pledge of a portion of the race track funds accruing annually to the County pursuant to Chapters 550 and 551, Florida Statutes, and in addition by a pledge of the County's non-ad valorem funds as defined in the Resolution and provides that the Public Improvement Bonds shall not constitute general obligations or indebtedness of the County within meaning of constitutional or statutory *556 limitations. The County Capital Projects contemplated include:
(1) Construction of Agricultural Center and Fairgrounds
(2) Construction of Road Department Complex
(3) Construction of Animal Shelter Building
(4) Development of Lake Kanapaha Recreational Area
(5) Construction of Tag Agency Building
(6) Additional Cost of Adult Detention Center
(7) Special Assessment Road Paving Projects
(8) Construction of Fairgrounds Exhibition Complex
(9) Improvements at Westside Boys' Club
* * * * * *
(16) Advance to Landfill and Refuse Collection Departments
(17) Construction of Newberry High School Athletic Field
(18) Development of Newnans Lake Park East[1]
The various items comprising the project proposed to be financed were commenced by the County before the adoption of the Bond Resolutions (Animal Shelter  1973-74 fiscal year, other enumerated items  1974-75 fiscal year).
An Order to Show Cause was issued directed to the State of Florida, through the State Attorney for the Eighth Judicial Circuit of said State, the several property owners, taxpayers and citizens of Alachua County, Florida, including non-residents owning property or subject to taxation therein, and all others having or claiming any right, title or interest in property to be affected by the issuance by Alachua County, Florida, of special obligation revenue bonds hereinafter more particularly described, or to be affected in any way thereby. Answer was filed by the State Attorney challenging the issuance. After hearing, the trial court entered a lengthy, detailed, and well-reasoned judgment validating the bonds.
The trial court determined that the State Attorney's contention that portions of the project described are not in furtherance of a proper county purpose to be without merit, and concluded that appellee pursuant to Chapter 69-805, Laws of Florida, is authorized to acquire, construct, equip, and furnish the county capital projects specified.
Relative to the points raised on appeal to this Court, the trial court found, inter alia:
"[5] In order to commence the projects in a timely fashion, the County has advanced funds available from its general fund, temporarily pending sale of the long-term bonds herein sought to be validated. In order to obtain such funds, the County has issued tax anticipation notes in prior years. Although the tax anticipation notes have been repaid, the advances for the project remain in the form of internal borrowing from temporarily idle money in its general fund, which will be repaid from the proceeds of the Public Improvement Bonds and the Special Obligation Bonds.
"[6] Stemming from the fact that the projects were commenced prior to validation or issuance of the bonds, the State Attorney has raised the objection to the validation that the projects were commenced before the adoption of Ordinances No. 77 and 78 of the Plaintiff which constitute enabling ordinances and *557 additional authority for issuance of the bonds."
Relying on this Court's decision in State v. Escambia County, 52 So.2d 125 (Fla. 1951), which is on all fours with the situation sub judice, the trial court explained:
"In the case pending before this Court, the uncontroverted evidence shows that Alachua County proceeded under its Special Act and other existing authority to go forward with certain capital projects, intending to issue revenue bonds to refund advances made for site acquisitions and construction and other costs. The facts appear to be on all four's with the Escambia County case. Alachua County's authority, at the time the projects were authorized and commenced, was contained in ch. 69-805, Laws of Florida, Special Acts of 1969. Section 1 of that Act authorized the Board of County Commissioners `to acquire, construct, furnish and equip county capital projects.' Section 2 authorized the Board to issue revenue bonds from time to time. Section 3 authorized repayment of the bonds from project revenues or from revenues of the County derived from sources other than ad valorem taxes. The uncontroverted evidence presented to the Court shows that the Board of County Commissioners approved the projects proposed for inclusion in this bond issue with the stipulation and expectation that the cost of those projects would be paid from the proceeds of revenue bonds issued pursuant to ch. 69-805 and other authority. With this understanding, the Board proceeded to commence the projects, or some of them, including the planning and, in some instances, construction. This is the same activity which was challenged in the Escambia County case. In this case, the State Attorney in his Answer raises the objection that the authority to issue revenue bonds is prospective only and that the Board of County Commissioners could not lawfully advance funds toward construction of bond projects, pending validation and issuance of revenue bonds, and then secure repayment to itself for such fund advancements. It is the Court's opinion that this issue was decided in the Escambia County case and that Alachua County had authority under ch. 69-805 to authorize the projects and commit itself to issue bonds repayable from revenue sources other than ad valorem taxes. The County's adoption in December 1975 of two bond ordinances reinforced the County's authority to pledge specific non-ad valorem tax sources of revenue, specifically general state revenue sharing funds and race track funds."
The trial court determined State v. Florida State Turnpike Authority, 134 So.2d 12 (Fla. 1961), reinforced this view. As further explanation of its view as applied to this particular factual situation, the trial judge stated:
"The County does not contend and the Court does not rule that the County could build and pay for a project, and then at some subsequent time decide to borrow money against it (mortgage it) by issuing bonds. In this case, no expenditures were made until the decision had been reached to build these capital projects as revenue bond projects. Only then were advances made in the interests of timesaving and savings in interest costs. The Court notes that testimony was produced that had the revenue bonds been validated and sold at an earlier time, the interest costs which the County would have had to pay would have been higher and that it was to the benefit of the County and its taxpayers to postpone issuance of the bonds until the market for sale of municipal and county bonds recovered from the uncertainties of 1975. The Board of County Commissioners exercised *558 sound business judgment in postponing issuance of the bonds in favor of a more settled market time."
As to the application of Article VII, Section 12, Florida Constitution, requiring a referendum before the pledging of ad valorem revenues, the trial court accurately explained that the plan of financing does not directly or indirectly pledge ad valorem taxes of the county but rather "... The resolutions authorizing the Public Improvement Bonds and Special Obligation Bonds clearly disclaim any pledge of ad valorem taxation for payment of the bonds, and therefore issuance of the bonds is also consistent with said constitutional provision." In further explication of this point and in refutation of the State's contention, the trial judge stated:
"In the case of Town of Medley v. State, 162 So.2d 257 (Fla. 1964), the Florida Supreme Court synthesized a number of prior holdings which concerned the indirect pledging of ad valorem tax revenues. In that case, the Town of Medley issued revenue bonds pledging revenues along with proceeds from cigarette and other taxes for repayment. The Court, per Justice O'Connell, admitted that the effect of the pledge of non-ad valorem tax revenues for bond repayments would probably bring about an increase in ad valorem taxes, but nevertheless approved validation, stating:
"`In any instance in which a municipality has been using funds from special non-ad valorem sources of revenue to meet its operating costs and then diverts those funds by pledging them to payment of a specific indebtedness as done here, the result will probably be that ad valorem taxes will have to be increased to make up the deficiency in funds available for operating expenses.
"`Nevertheless, this result does not make the revenue bonds or certificates subject to the provisions of Section 6, Article IX, of our State Constitution, F.S.A. A contrary holding would mean that any pledging of non-ad valorem revenues previously used for the general operating expenses of a municipality would require approval by vote of the freeholders and such was never the purpose of the cited constitutional provisions.'" (Id. at 258)
Every detail as to the validity of the bond issuance was cogently evaluated by the trial judge. We agree with his conclusion and judgment that all requirements of the constitution and the laws of this State pertaining to the enabling act and proceedings have been followed.
Having examined the record and briefs in the cause, heard oral argument, and considered the matter carefully and it appearing that the able trial judge was eminently correct in validating the bond issuances and that his judgment is free from reversible error, the final judgment is hereby
AFFIRMED.
OVERTON, C.J., and ADKINS, BOYD, ENGLAND, SUNDBERG and HATCHETT, JJ., concur.
NOTES
[1] During the hearing, plaintiff moved, without objection from the State Attorney, to strike items numbered 10 to 15 inclusive from the description of the project. The trial court granted this motion.