417 So.2d 968 (1982)
COUNTY OF VOLUSIA, a Political Subdivision of the State of Florida, Appellant.
v.
The STATE of Florida, and the Taxpayers, Property Owners, and Citizens of the County of Volusia, Including Nonresidents Owning Property or Subject to Taxation Therein, et al., Appellees.
No. 61267.
Supreme Court of Florida.
June 10, 1982.
Rehearing Denied August 30, 1982.
Daniel R. Vaughen, Asst. County Atty., DeLand, and David A. Monaco of Cobb & Cole, Daytona Beach, for appellant.
Stephen L. Boyles, State Atty., and Jeffrey L. Dees, Asst. State Atty., Seventh Judicial Circuit, DeLand, and C. Allen Watts, DeLand, for appellees.
Craig T. James, DeLand, for Alfred Hayman, appellee/intervenor.
*969 Harry A. Stewart, Gen. Counsel and Susan F. Delegal, Asst. Gen. Counsel, Fort Lauderdale, for Broward County, amicus curiae.
Richard E. Nelson of Nelson, Hesse, Cyril, Weber, Smith & Widman, Sarasota, for Sarasota County, amicus curiae.
BOYD, Justice.
This cause is before the Court on appeal from a judgment of the circuit court denying the complaint of the County of Volusia for validation of capital improvement bonds in the amount of $40,000,000. We have jurisdiction. Art. V, § 3(b)(2), Fla. Const.
The county seeks to issue the bonds to finance construction of a jail to be located on Indian Lake Road eleven miles from DeLand, the county seat. The payment of the bonds is to be secured by the county's pledge of all legally available, unencumbered sources of county revenue including all money derived from regulatory fees and user charges assessed by the county. The county also covenants to do all things necessary to continue receiving the various revenues pledged.
The trial court found the proposed bond issue to be unlawful on three grounds. The court determined that most of the various revenues from regulatory fees and user charges could not be pledged to the payment of the bonds because such county revenues may not be diverted from their lawful purposes, which are to defray the costs incurred by the county in providing the services to which the various fees and charges relate. Second, the court found that the pledge of all legally available revenues other than ad valorem taxation would have the effect of requiring the levy of increased ad valorem taxation so that, under article VII, section 12, Florida Constitution,[1] the bonds may not be issued without approval of the eligible voters by referendum. Third, the court held that the purpose of the bond issue is improper in that the construction of a county jail eleven miles outside the county seat would violate article VIII, section 1(k), Florida Constitution[2] and section 138.09, Florida Statutes (1981).[3]
The County of Volusia argues that the trial court was wrong on all three counts and asks that we reverse and order the bonds validated so that it can proceed with construction of the much-needed jail. We affirm the trial court's judgment denying validation. We hold that the pledge of all the legally available, unencumbered revenues of the county other than ad valorem taxation, along with a covenant to do all things necessary to continue receiving the revenues, as security for the bonds, will have the effect of requiring increased ad valorem taxation so that a referendum is required. Our disposition of the case on this ground makes it unnecessary to reach *970 and settle the questions of whether the various non-ad valorem revenues may be pledged to the financing of a jail facility. We will address the question of the legality of locating the new jail eleven miles outside the county seat in order to provide guidance for the future actions of the parties.
We will discuss first the location issue, and then explain the reasons for our holding on the dispositive issue, that this bond issue requires a referendum.

I.
The trial court held that the proposal to build the jail eleven miles away from the county seat was violative of article VIII, section 1(k), which provides that the principal offices and permanent records of all county officers shall be located at the county seat, and section 138.09, Florida Statutes (1981), which requires the county commissioners to erect a courthouse and a jail at the county seat.
The county has a courthouse and a jail both located in DeLand, the county seat. The jail in DeLand is used generally for pretrial detention purposes, while a separate correctional facility for sentenced prisoners in the county's custody has been constructed and is located at or adjacent to the site proposed for the new jail, eleven miles from DeLand.[4]
Although article VIII, section 1(k), Florida Constitution, requires that the principal offices and permanent records of all county officers be located at the county seat and section 138.09 requires the county commissioners to erect a courthouse and a jail at the county seat as soon as the county seat has been decided upon by the electors, we note that section 138.12, Florida Statutes (1981),[5] permits county commissioners to expand the geographical area of county seats without expanding the boundaries of the municipality named as the county seat. If the Volusia County Council exercises its authority under section 138.12 and expands the county seat to include the Indian Lake Road location, the new jail lawfully could be the "county jail" of Volusia County.
Also, without expanding the geographic area of its county seat, Volusia County could lawfully locate the new jail on Indian Lake Road if it were in fact a branch jail. Article VIII, section 1(k), Florida Constitution, provides for the establishment of branch offices outside the county seat. The fact that the new jail would be larger than the present "county jail" in DeLand would not necessarily preclude it *971 from being designated a branch jail, if the county should elect to maintain the "county jail" in DeLand.

II.
We discuss now the dispositive issue and hold that the pledge of all legally available, unencumbered revenues  i.e., all revenues, other than ad valorem taxation, which the governing body has the authority to spend or pledge at its discretion  calls into play the referendum requirement of article VII, section 12 because it in effect constitutes a promise to levy ad valorem taxes. The county correctly states that this Court has approved pledges of various local government revenue sources without referendum even though the encumbrance of the funds would have an incidental effect on the exercise of the ad valorem taxing power. State v. Alachua County, 335 So.2d 554 (Fla. 1976); Town of Medley v. State, 162 So.2d 257 (Fla. 1964). In Town of Medley v. State, 162 So.2d 257 (Fla. 1964), a municipality proposed to construct a water supply system and building together with storm sewers and streets and to finance these improvements by the sale of revenue bonds. As security for the payment of the bonds, the town pledged to their retirement the revenues to be earned by the water system, together with revenues from the following four specific sources: the proceeds from cigarette taxes, a municipal utility franchise tax, utilities taxes, and occupational license taxes. The bond issue was challenged on the ground that diverting these revenues from the town's general operating fund would require increased ad valorem taxes in order to replace those funds, and that such a result required approval by referendum. This Court responded:
Only bonds or certificates of indebtedness which directly obligate the ad valorem taxing power are encompassed by [the constitutional referendum requirement]. The incidental effect on use of the ad valorem taxing power occasioned by the pledging of other sources of revenue does not subject such bonds or certificates to that constitutional requirement.
162 So.2d at 258. The Court said that to hold otherwise would prevent a local government from pledging non-ad valorem funds previously used for general operating expenses without a referendum, a result not required in light of the purpose of the constitutional requirement.
In State v. Alachua County, 335 So.2d 554 (Fla. 1976), we held that the county's pledge of its annual revenue sharing funds and its annual share of state race track funds to the repayment of bonds issued to finance various capital projects and public improvements without referendum did not violate article VII, section 12. Citing Town of Medley v. State as authority, we again held that only a direct pledge of, and not indirect impact on, the ad valorem taxing power required referendum approval.
The present case differs from both Town of Medley v. State and State v. Alachua County. One point of distinction is that here the county has attempted to pledge all legally available revenue sources other than ad valorem taxation, rather than several specific sources. Secondly, here the county has further promised to fully maintain the programs and services which generate the service fees and user charges. To maintain all of the programs that produce the revenues, while devoting the revenues themselves to the retirement of the bonds, will inevitably require that ad valorem taxes be increased so that the county will have sufficient operating revenue to maintain the programs and services that generate the pledged revenues.
In State v. Halifax Hospital District, 159 So.2d 231 (Fla. 1963), a special district with ad valorem taxing power attempted to pledge as security for bonds all of its available revenues. The district also covenanted to fully maintain its operations in order to ensure that it continued to receive the pledged revenues. The general operations of the district were funded through ad valorem taxation. This Court held that the district's pledge of all available non-ad valorem revenues, together with the promise to maintain all operations during the life of the bonds, would have more than mere incidental *972 effect on the ad valorem taxing power. The Court held that therefore the bonds could not be validated without the approval of the voters.
That which may not be done directly may not be done indirectly. See, e.g., State v. Halifax Hospital District, 159 So.2d 231 (Fla. 1963). While the county has not directly pledged ad valorem taxes to the payment of the bonds, its pledge of all other available revenues, together with its promise to do all things necessary to continue to receive the various revenues, will inevitably lead to higher ad valorem taxes during the life of the bonds, which amounts to the same thing. We find in this case that the pledge of all available revenues, together with a promise to maintain the programs entitling the county to receive the various revenues, will have a substantial impact on the future exercise of ad valorem taxing power and brings this case within the rule of Halifax Hospital District. The taxpayers of Volusia County must have an opportunity to vote on the bond issue.
In summary, we hold that the county may build a jail eleven miles outside the county seat either by expanding the county seat or by maintaining the new jail as a branch jail. In view of our decision holding the bond issue unlawful, we need not decide the validity of the various sources of revenue (regulatory fees and user charges) pledged to the payment of the bonds. We hold, finally, that the pledge of all available funds has more than a mere incidental effect on the exercise of ad valorem taxing power and requires a referendum under article VII, section 12.
Accordingly, the order denying validation is affirmed.
It is so ordered.
SUNDBERG, C.J., and McDONALD and EHRLICH, JJ., concur.
ALDERMAN, J., dissents with an opinion, in which ADKINS and OVERTON, JJ., concur.
ALDERMAN, Justice, dissenting.
I would reverse the trial court and remand with directions that these bonds be validated.
I agree with the majority that Volusia County may build the proposed new jail outside the municipal boundaries of its county seat without violating article VIII, section 1(k), Florida Constitution, and section 138.09, Florida Statutes (1981). It could accomplish this by expanding the geographic area of DeLand as provided by section 138.12, Florida Statutes (1981). Alternatively, without expanding the geographic area of the county seat, Volusia County could lawfully locate the new jail outside the municipal boundaries of DeLand if the "county jail" was maintained in DeLand and if the new jail was in fact a branch jail.
I disagree, however, with the majority's conclusion that these bonds require referendum approval under article VII, section 12, Florida Constitution. This Court has repeatedly upheld the validity of pledges of local non-ad valorem revenue sources without referendum approval. In State v. Tampa Sports Authority, 188 So.2d 795 (Fla. 1966), we affirmed the trial court's validation of bonds to be issued for the development and maintenance of a sports facility where the city and county agreed that repayment of the bonds should be from available moneys derived from sources other than the proceeds of ad valorem taxation. Citing State v. City of Jacksonville, 53 So.2d 306 (Fla. 1951), we said:
We have repeatedly held that when certificates of indebtedness are for an authorized public purpose and are payable solely from revenues derived from utilities service, excise taxes, licenses or some other source than ad valorem taxes, they may be issued without an approving vote of the freeholders as required by Section 6, Article IX of the Constitution.
188 So.2d at 797. See also State v. Monroe County, 81 So.2d 522 (Fla. 1955).
We have upheld such pledges by local governments even though ad valorem taxes probably would be affected. In Town of Medley v. State, 162 So.2d 257 (Fla. 1964), *973 the trial court denied validation of public improvement revenue bonds which were to be repaid with revenues from a proposed water system, proceeds of the cigarette tax, franchise taxes on electric power, utility taxes, and occupational license taxes. Although no ad valorem taxes were pledged and the ordinance authorizing the bond issue specifically provided that the town would not be obligated to levy ad valorem taxes for repayment of the bonds, the trial court concluded that validation of the bonds would result in an increase in real property taxes without vote of the freeholders. In reversing the order denying validation, this Court held:
In any instance in which a municipality has been using funds from special non-ad valorem sources of revenue to meet its operating costs and then diverts those funds by pledging them to payment of a specific indebtedness as done here, the result will probably be that ad valorem taxes will have to be increased to make up the deficiency in funds available for operating expenses.
Nevertheless, this result does not make the revenue bonds or certificates subject to the provisions of Section 6, Article IX, of our State Constitution, F.S.A. A contrary holding would mean that any pledging of non-ad valorem revenues previously used for the general operating expenses of a municipality would require approval by vote of the freeholders and such was never the purpose of the cited constitutional provision.
Only bonds or certificates of indebtedness which directly obligate the ad valorem taxing power are encompassed by Section 6, Article IX, Fla. Const. The incidental effect on use of the ad valorem taxing power occasioned by the pledging of other sources of revenue does not subject such bonds or certificates to that constitutional requirement.
162 So.2d at 258. More recently, we reaffirmed this position in State v. Alachua County, 335 So.2d 554 (Fla. 1976).
This issue is not governed by State v. Halifax Hospital District, 159 So.2d 231 (Fla. 1963), wherein we declined to affirm validation of hospital improvement bonds to be repaid from gross revenues of the hospital. In that case, we held that the hospital's pledge of all gross revenues coupled with its pledge not to reduce during the life of the bonds the currently assessed ad valorem tax levy for maintenance and operation of the hospital required referendum approval. We found that the hospital's pledge of ad valorem taxes was as much an obligation of the bond resolution as was the pledge of the gross revenues. Volusia County, unlike the Halifax Hospital District, has not expressly pledged ad valorem taxes to continue the operation of those governmental functions needed to generate the revenues to repay the bonds.
In the present case, as in Town of Medley and Alachua County, the authorizing documents specifically state that the ad valorem taxing power is not directly pledged to repayment of the bonds and such repayment cannot be compelled by the bondholders. The pledge of non-ad valorem funds results in a diversion of funds from the county's general revenue and probably will require ad valorem taxes to be increased to make up the deficiency in funds available for operating expenses, but I would hold, as we did in Town of Medley and Alachua County, that such an incidental effect on Volusia County's ad valorem taxing power does not require referendum approval pursuant to article VII, section 12 of the Florida Constitution.
With its disposition of the referendum issue, the majority found it unnecessary to pass on the correctness of the trial court's finding that the county had unlawfully pledged its regulatory and user fees. Because, in my view, a referendum is not required, it becomes necessary to resolve this issue. I find that the trial court wrongly decided that the pledge of the regulatory and user fees was invalid.
Since the regulatory and user fees pledged are ostensibly collected by virtue of the police power to offset the costs of certain regulatory and governmental services provided by the county, the trial court concluded *974 that use of these fees to pay the bondholders would amount to an unlawful diversion of funds because such use would be wholly unrelated to the purposes for which they were collected and that these fees would, in effect, become non-ad valorem taxes not authorized by statute and therefore in violation of article VII, section 1, Florida Constitution.[1]
The trial court based its holding on several decisions which I find to be inapposite to the present validation proceeding. The first three deal with impact fees and are not bond validation cases. Broward County v. Janis Development Corp., 311 So.2d 371 (Fla. 4th DCA 1975), involved a challenge by several land development corporations to the legality of a county ordinance imposing a land use fee which had to be paid before the developers could build. The district court determined that the fee was an improper tax. It explained that the ordinance contained no specifics as to where and when the moneys were to be expended and that the anticipated revenue that would be generated the first year far exceeded any cost of regulation.
Contractors & Builders Ass'n of Pinellas County v. City of Dunedin, 329 So.2d 314 (Fla. 1976), involved a challenge by building contractors and owners of land within Dunedin's city limits to the legality of an ordinance authorizing the municipality to charge an impact fee for the privilege of connecting to its water and sewer system. Plaintiffs contended that the fees collected upon issuance of the building permits and earmarked for expansion of the water and sewage system as a whole constituted unlawful taxes. Although finding that the connection fees were not taxes, we held that a revenue-producing ordinance must explicitly set forth restrictions on the revenues it generates where such restrictions are essential to its validity and that the ordinance was defective for failing to spell out the necessary restrictions on the use of fees authorized by the ordinance. Absent express limiting language in the authorizing ordinance, we determined, there would be no check on the accounting for and the application of the revenue for its intended purpose.
Christian & Missionary Alliance Foundation, Inc. v. Florida Cities Water, 386 So.2d 543 (Fla. 1980), concerned a Public Service Commission order requiring a developer to pay a water unit connection charge which was a new service availability charge. In challenging the commission's order, the developer relied on Contractors & Builders Ass'n and argued that the service availability charge was invalid because the use of the funds was not limited. We affirmed the commission's order and distinguished Contractors & Builders Ass'n on the basis that it involved a municipal utility not regulated by the commission.
In addition to the three impact fee cases, the trial court cited McGovern v. Lee County, 346 So.2d 58 (Fla. 1977), a bond validation case, for the principle that the pledge of the fees must bear a reasonable relation to the purpose or subject matter for which the fees are presently collected. McGovern, however, was a chapter 159 bond issue involving a self-liquidating project. Therein, we emphasized these two factors in reversing the trial court's validation of the Sanibel Bridge improvement bonds. We held that inherent in the scheme of chapter 159 for funding self-liquidating projects is the principle that those who substantially benefit from the project should pay the cost. Using a chapter 159 bridge as a self-liquidating project to pay for improvements, we said, requires a finding of benefit to those who use the bridge. In other words, a sufficient and direct relationship between the use of the toll bridge and the use of the Sanibel projects must be shown. We concluded that the record failed to establish that the majority of the improvements would make any significant contribution to traffic over the bridge, and thus using the toll to pay for the proposed bonds would *975 place an undue burden on island residents and visitors.
The trial court also relied upon Chase v. City of Sanford, 54 So.2d 370 (Fla. 1951), another bond validation case. In Chase, the bond issue was for the construction and operation of a port terminal facility and was authorized by Special Act 26466, Acts 1949, Extraordinary Session. The bonds were to be payable solely from a special fund composed of net revenues from operation of the port terminal and net proceeds of the city's parking meter revenues. The principal issue in that case was whether or not the provisions obligating the net proceeds of the city's parking meter revenues to the servicing of the port terminal bonds were valid. Holding the provisions of the bonds and enabling legislation invalid, we emphasized that the enabling legislation expressly required the city to maintain the existing parking meters at their present locations and to maintain the present system of rates and charges as long as the port terminal bonds remain unpaid and that this amounted to the city's contracting away its authority, under the police power, to regulate traffic.
In the present case, as distinguished from the impact fee cases, there was no challenge on the ground that the regulatory and user fees exceeded the reasonable cost of the regulation or services to be performed. The trial court did not find that the amount of any particular fee charged for a particular regulation or service exceeded the cost of the regulation or service. If any of the fees constituting a portion of the pledged non-ad valorem revenues is subsequently successfully challenged by those having to pay the fee on the basis that it is an unlawful tax, then it would no longer be a portion of the "legally available," unencumbered non-ad valorem revenues pledged to repayment of the bonds. Any such individual challenges on this basis are issues collateral to this bond validation proceeding.
In the present case, as distinguished from Chase, Volusia County is not precluded from reducing the amount or rate of the non-ad valorem funds as long as the funds collected by the county are sufficient to make the bond payments. Nor is the county obligated to maintain each and every department or any particular department.
Furthermore, the new jail facility in Volusia County is not a self-liquidating project as were the projects in McGovern and Chase, and here, as distinguished from those cases, the county proceeded solely under chapter 125 as authority for issuance of the bonds. We have repeatedly held that a county may elect to proceed solely under the provisions of chapter 125. See e.g. Speer v. Olson, 367 So.2d 207 (Fla. 1978). Nothing in general or special law precludes Volusia County from pledging these legally available, unencumbered non-ad valorem revenues to the repayment of these bonds. In fact, this Court has approved the pledge of similar revenues where the revenues are not necessarily related to the improvements to be financed by the bond issuance. See e.g. State v. Alachua County; Town of Medley v. State; Panama City v. State, 93 So.2d 608 (Fla. 1957); State v. Monroe County; State v. City of Coral Gables, 72 So.2d 48 (Fla. 1954). I conclude that the trial court erred in finding that the pledge of the regulatory and user fees was invalid.
Accordingly, I would reverse the trial court's order and remand with directions that these bonds be validated.
ADKINS and OVERTON, JJ., concur.
NOTES
[1] Article VII, section 12, provides:

Counties, school districts, municipalities, special districts and local governmental bodies with taxing powers may issue bonds, certificates of indebtedness or any form of tax anticipation certificates, payable from ad valorem taxation and maturing more than twelve months after issuance only: (a) to finance or refinance capital projects authorized by law and only when approved by vote of the electors who are owners of freeholds therein not wholly exempt from taxation....
[2] Article VIII, section 1(k) provides:

COUNTY SEAT. In every county there shall be a county seat at which shall be located the principal offices and permanent records of all county officers. The county seat may not be moved except as provided by general law. Branch offices for the conduct of county business may be established elsewhere in the county by resolution of the governing body of the county in the manner prescribed by law. No instrument shall be deemed recorded in the county until filed at the county seat according to law.
[3] Section 138.09, Florida Statutes (1981), provides:

The county commissioners shall, within 5 days after the election provided for in s. 138.07 is held, meet and publicly canvass the same, and the place receiving the majority of all the votes cast shall be the county seat for the next 10 years, and the said county commissioners shall erect, as soon as possible, a courthouse and jail, and provide suitable offices for all the county officers who are required by law to keep their offices at the courthouse at the place so selected as the county seat aforesaid.
[4] As the trial court correctly found, the evidence amply supports the county's determination of the need for a new facility. The present county jail located in DeLand is inadequate to hold the county's average daily presentence prisoner population of 368. A federal court order has placed a temporary limit of 192 on the prisoner population at the jail because of perceived violations of federal constitutional standards by existing conditions at the jail. The remaining presentence prisoners are housed in the county's correctional facility and in leased space in the jails in Daytona Beach and New Smyrna Beach. The county has concluded that enlarging the jail in DeLand by adding two floors would be too costly and inadequate to meet its present or projected needs for space. Designed to meet the county's current and projected presentence prisoner population needs into the 1990s, the new facility would contain over 260,000 square feet, cover about seven acres, and hold 601 prisoners. A master plan being considered by the county council provides that, in addition to the jail and correctional facilities, the Indian Lake Road location eventually would include the sheriff's offices, criminal courtrooms, judges' chambers, clerk's offices, state attorney and public defender offices, court reporters' offices, and other related offices.
[5] Section 138.12 provides:

The board of county commissioners of any county may expand the geographical area of the county seat of its county beyond the corporate limits of the municipality named as the county seat by adopting a resolution to that effect at any regular or special meeting of the board. Such a resolution may be adopted only after the board has held not less than two public hearings on the proposal at intervals of not less than 10 or more than 20 days and after notice of the proposal and such meetings has been published in a newspaper of general circulation in the county. However, nothing herein shall be deemed to extend the boundaries of the municipality in which the county seat was previously located or annex to such municipality the territory added to the county seat.
[1] The trial court did acknowledge that fees collected by the sheriff for the performance of civil functions and fees collected by the clerk of the court can properly be pledged because they bear a reasonable relationship to the new jail facility.