931 So.2d 121 (2006)
Rick BARNETT, as Property Appraiser of Bay County, Florida, and Peggy Brannon, as the Tax Collector for Bay County, Florida, Appellants/Cross-Appellees,
v.
DEPARTMENT OF MANAGEMENT SERVICES, Appellee/Cross-Appellant.
No. 1D05-1731.
District Court of Appeal of Florida, First District.
March 27, 2006.
Opinion Denying Rehearing May 22, 2006.
*122 Larry E. Levy and Loren E. Levy of The Levy Law Firm, Tallahassee, for Appellant/Cross-Appellee, Rick Barnett.
Douglas L. Smith of Burke, Blue, Hutchinson & Walters, P.A., Panama City, for Appellant/Cross-Appellee, Peggy Brannon.
Robert C. Reid and Theresa Proctor of Bryant, Miller & Olive, P.A., Tallahassee, and Michael S. Davis of Bryant, Miller & Olive, P.A., Tampa, for Appellee/Cross-Appellant.
ERVIN, J.
The property appraiser, Rick Barnett, and tax collector, Peggy Brannon, of Bay County, Florida (collectively, property appraiser), appeal a final judgment deciding that the real property on which the Bay Correctional Facility (facility) is located was immune from ad valorem property taxes because the Department of Management Services (DMS), the lessee under a lease-purchase agreement (LPA), was the property's equitable owner. As a consequence, the court directed the property appraiser to set aside the assessments he made for the taxable years 1999 through 2002. The Department cross-appeals the lower court's failure to declare the subject property immune from taxation since 1994, the date it asserts it first became the *123 equitable owner of the property. We affirm all issues, but address only those raised by appellants.
The facts, as stipulated by the parties, disclose that the Florida Legislature enacted the Correctional Privatization Commission Act, sections 957.01-957.16, Florida Statutes (1993), which was designed to privatize the operation of state prison facilities, and in order to accomplish that purpose, it created the Correctional Privatization Commission (CPC),[1] a public entity acting within DMS. § 957.03(1), Fla. Stat. (1993). In implementing the legislative goals, the Bay County Private Correctional Facility Finance Corporation (Finance Corporation),[2] a private, not-for-profit corporation, was created in 1994, for the purpose of acquiring the title to the property on which the facility would be located. Shortly thereafter the Panama City Port Authority transferred title of the real property to the Finance Corporation, which then leased the facility and its property to the CPC, pursuant to the terms of the LPA, which made the CPC responsible for providing all insurance, repairs and maintenance of the facility, and all risk of loss. Finally, under its terms, the CPC was given an option to purchase the facility and receive all the interests of the lessor upon expiration of the lease, with no further payment.
The Finance Corporation entered into a separate agreement with NationsBank of Florida, N.A., as trustee (Trustee), and it transferred its interest in the LPA to the Trustee. Pursuant to the agreement, the Trustee issued certificates of participation (COPs) to investors, the proceeds of which were used by the Finance Corporation to acquire the property on behalf of the CPC and to construct the facility. In order to secure the issuance of the COPs, the Finance Corporation mortgaged its interest in the property to the Trustee, and thereafter the CPC, the Finance Corporation, and the Correctional Corporation of America (CCA), a private corporation, entered into a contract for CCA to construct the correctional facility, and the CPC and CCA executed a separate contract for its operation. The state has appropriated funds to the CPC on an annual basis in an amount sufficient to pay the annual lease payments to the Trustee, as required by the LPA, and to pay the cost of operating the facility.
Thereafter, the property appraiser assessed both the real and personal property and placed them on the tax rolls for the years 1995-2002. In 1997, both the CPC and the Finance Corporation filed complaints challenging the assessments of the property for the years 1995-1997, which were dismissed. The CPC filed separate complaints challenging the assessment of the property for the tax years 1999-2002, which resulted in the final judgment appealed, declaring the property immune from ad valorem property taxation during the later years challenged.
The property appraiser first argues that the LPA, which is part of the financing arrangement used for the construction and operation of the prison facility, is precisely that, a lease, and not a mortgage; therefore, it could not legally transfer equitable ownership of the property to the CPC, and, because legal ownership to the property remained in a private entity, the Finance Corporation, the property could not be deemed immune from taxation. The appraiser alternatively argues that if, in fact, the lease had the effect of transferring *124 equitable ownership to the CPC, its legal effect was that of a mortgage given to secure the repayment of the debt evidenced by the mortgage the Finance Corporation conveyed to the Trustee; therefore, the repayment of the COPs for the purpose of satisfying the debt by state funds would have required compliance with the referendum provision of article VII, section 12 of the Florida Constitution, and because there was none, the debt was invalid. See Nohrr v. Brevard County Educ. Facilities Auth., 247 So.2d 304 (Fla. 1971). Finally, the appraiser argues that the legislature, in enacting the CPCA, reasonably intended that the contractor which operated the facility, CCA, would be the lessee of the property, not CPC; therefore, if equitable title was transferred, it was conveyed to CCA, a private entity, making the property subject to taxation. We cannot agree with any of these arguments.
In our judgment, the issue of the property's status is controlled by the Florida Supreme Court's decision in Leon County Educational Facilities Authority v. Hartsfield, 698 So.2d 526 (Fla.1997), wherein the court was asked whether property leased to the Leon County Educational Facilities Authority (LCEFA) from a non-profit entity under an LPA was subject to ad valorem taxes. Somewhat similar to the case at bar, SRH, Inc., a private, non-governmental entity, served as the lessor under the agreement, and in such capacity it was required to "acquire, construct, and equip the project and lease it to the Authority in exchange for periodic rental payments." Id. at 527. COPs were sold to finance the dormitory project and investors received a fractional interest in the rental payments made by the authority. Id. Once the certificates were fully paid, the Authority had the option under the lease of purchasing the dormitory project for $1.00. Id. The terms of the agreement also provided that the lessee, the Authority, "shall pay any taxes which may be assessed against the project." Id. After the property appraiser's denial of the authority's application for an ad valorem tax exemption, the Authority and SRH sought declaratory relief, and their complaint was dismissed, which was affirmed by this court on appeal for the reason that the property was not exempt because SRH, a private entity, rather than the public Authority, held legal title to the property. Id. at 527-28.
Applying the doctrine of equitable ownership, the Florida Supreme Court quashed this court's decision, concluding that the project was exempt from taxation because the Authority, a public entity, not SRH, was its equitable owner. Id. at 529. In so deciding, the court noted that the Authority held "virtually all the benefits and burdens of ownership." Id. at 530. Among other things, the court noted that the Authority was responsible for maintaining and insuring the project and, more to the point, it could purchase the project for a nominal sum upon termination of the lease. Id. at 527. In reaching its decision, the court emphasized the use of the property and the lack of benefits acquired by SRH under the lease:
It is unlikely that the legislature intended that property being used by the Authority for its authorized purpose should be denied a tax exemption solely because it does not hold bare legal title. The only reason legal title is held by SRH is to facilitate the financing of the project. In essence, SRH is a conduit through which the lease payments are used to repay the COPS holders. Under the lease, SRH can make no profit on the project.
Id. at 529. Despite the factual similarities between the Hartsfield financing arrangement and that in the present case, the *125 county argues that Hartsfield is not controlling.
The property appraiser fails to show how the occurrence of a bond validation proceeding would in the instant case have any impact upon a determination of equitable ownership, any more than such proceeding would have affected the determination in Hartsfield, in which no mention was made of the necessity of a referendum. The relative burdens and benefits flowing to the lessor and lessee are controlled in both cases by the financing arrangement and the LPA. In this case, the majority of the benefits and burdens of the prison ownership flow to the state, while virtually none are conveyed to CCA.
Although the property appraiser argues that the contractor, CCA, is the equitable owner of the prison facility due to the terms of an operation and management service contract between it and the CPC, in which CCA agreed to operate and manage the project and be responsible for all lawful taxes assessed on the property, this argument fails to acknowledge that CCA was not the lessee under the terms of the LPA, but rather CPC, and, indeed, CCA was not a party to the LPA. Similar to SRH, the non-profit corporation in Hartsfield which leased the project to the Authority, in the present case, the Finance Corporation, also a non-profit corporation, was established solely to facilitate the financing of the facility, and it, too, leased the property to a governmental agency. The Finance Corporation, like SRH, holds bare legal title to the property, and, although it mortgaged its interest in the property to the Trustee, it has no obligation to repay the funds secured by the issuance of the COPs to construct the facility under the terms of the mortgage if the legislature fails to appropriate sufficient amounts for such purpose. Moreover, as the lessor, the Finance Corporation collects none of the rent paid by the state under the agreement, as it has assigned its right to rental payments under the LPA to the Trustee, which in turn, are applied by the Trustee to the payment of principal and interest on the COPs. As a result, the Finance Corporation has obtained no burdens or benefits of ownership under the LPA.
While CCA had a stake in the construction and operation of the prison, its potential gains or losses were derived solely from its status as a contractor, and not as a tenant. The benefits it received were obtained under the terms of the operation and management service contract in its role as general contractor for the construction of the prison, and as a contract provider of correctional services, and not as a lessee. Thus, because it also had none of the benefits or burdens associated with owning the prison, it cannot be considered the property's equitable owner.
It is obvious, under the contractual terms, that only the state, operating through the CPC, can in fact occupy the status of equitable owner. Subject to annual appropriations, the CPC is ultimately responsible for repaying the COPs issued to construct the prison. Finally, following the final payment under the agreement, the concluding payment is "$0.00," and the Finance Corporation is then required to convey its fee-simple interest to the CPC. As a result, we consider the facts essentially indistinguishable from those in Hartsfield, and we agree with the lower court that the state, acting through the CPC, must be considered the equitable owner of the facility.
The property appraiser next argues that if the CPC has acquired such status, the state was constitutionally prohibited from entering into the agreement, because it constitutes a public debt without a referendum vote by the people. The decisions *126 that the property appraiser relies upon, State v. School Board of Sarasota County, 561 So.2d 549 (Fla.1990), and State v. Brevard County, 539 So.2d 461 (Fla.1989), offer little support for his argument. In each case, the supreme court found that a referendum was not constitutionally required to approve lease-purchase financing arrangements similar to those involved at bar, because the governmental entities did not secure their obligations with a pledge of ad valorem taxes, or a mortgage with the right of foreclosure. See Sarasota County, 561 So.2d at 553. In rejecting the argument that such a financing arrangement required a referendum, the court in Sarasota County concluded:
The state contends that County of Volusia v. State, 417 So.2d 968 (Fla. 1982), precludes validation in this instance. We disagree. In Volusia, the obligations were supported by the pledge of all legally available unencumbered revenues other than ad valorem taxation, along with a promise to fully maintain the programs and services which generated the non-ad valorem revenue. We held that referendum approval was required because the interrelated promises "in effect constitutes a promise to levy ad valorem taxes." Id. at 971. The instant case is not analogous. We have here no interrelated promises which will inevitably lead to an increase in ad valorem taxation.

The state in addition argues that validation is precluded by Nohrr v. Brevard County Educational Facilities Authority, 247 So.2d 304 (Fla.1971). In Nohrr, we held that a bond-supporting agreement which granted a mortgage with right of foreclosure violated the predecessor to article VII, section 12, absent an approving referendum. The rationale of Nohrr does not apply to the instant case. There is no mortgage with right of foreclosure. Here the bondholders are limited to lease remedies and the annual renewal option preserves the boards' full budgetary flexibility.

Id. at 553 (emphasis added) (footnote omitted). Moreover, the court did not hold that such a lease-purchase financing arrangement did not constitute debt. In fact, the court specifically recognized that governmental entities involved became debtors under the financing arrangement:
In the instant cases, likewise, the supporting agreements-the facilities and ground leases and the trust agreements-are evidence of the boards' indebtedness. They constitute obligations of the boards, so long as funds are appropriated, to pay the designated revenues to the trustees to assist in servicing the bonds.
Id. at 552 (emphasis added).
In this case, the CPC is in the same position as that of the school boards in Sarasota County and the county in Brevard County. The CPC is indebted to the COP holders. As long as funds are annually appropriated, the CPC is required to make principal and interest payments on its debt. A default in the payments required under the mortgage would occur only if the state defaulted in the payments required by the LPA. Under such circumstances, the state would cease to be the equitable owner of the property; the Finance Corporation would become both its legal and equitable owner, and the Trustee could then pursue its remedies to enforce the mortgage against the Finance Corporation, not the CPC. As a result, the holders of the COPs are in no better position than the bondholders in State v. Miami Beach Redevelopment Agency, 392 So.2d 875, 898-99 (Fla.1980), to compel the state by judicial action, if the obligations of the debt represented by the COPs could not be fulfilled, to satisfy the indebtedness. *127 As a result, neither Sarasota County nor Brevard County provides support for the proposition that the CPC could not assume debt in the absence of a referendum.
The property appraiser next argues that in enacting chapter 957, the legislature intended that facilities constructed pursuant to such legislation would be subject to ad valorem taxation in their status as private prison facilities. Only by fixing on isolated portions of the legislation is the property appraiser able to reach such conclusion, one with which we cannot agree. Among other things, he points to section 957.03(1), requiring the CPC to enter into contracts with contractors for the purpose of designing, leasing, constructing and operating the facilities, and section 957.04(2)(c), designating the contractor, not the CPC, as the entity responsible for obtaining the financing necessary to design and construct the facility. This argument overlooks the fact that section 957.04(2)(a) authorizes the use of tax-exempt financing of the facilities through the issuance of tax-exempt bonds, COPs and LPAs.
A well-recognized maxim of statutory construction is that the legislature must be presumed to be aware, at the time it enacts new legislation, of the status of the law then existing, including pertinent judicial case law. Thus, when the legislature adopted chapter 957 in 1993, it was no doubt aware of the supreme court's decisions in Sarasota County and Brevard County, approving financing arrangements involving LPAs through the issuance of bonds or COPs which would be paid from sources that included ad valorem taxes, and that such arrangements did not require a public referendum. Any lingering uncertainty as to the legislative intent behind the creation of the Act was, in our opinion, clearly dispelled by the legislature's addition of subsection (8) to section 957.04 in 1999, which provides that the buildings and other improvements financed under subsection (2)(a) and leased to the CPC would, upon the expiration of the lease, become the property of the state.
AFFIRMED.
WOLF and DAVIS, JJ., concur.

ON MOTION FOR REHEARING OR CERTIFICATION
ERVIN, J.
Appellant, Rick Barnett as Property Appraiser of Bay County, Florida, seeks rehearing or certification of the question decided in the March 27, 2006, opinion in this cause. Because the points raised by appellant as grounds for rehearing were considered and rejected by this court in deciding the case, we deny the motion for rehearing. In that the question raised in this case has, however, been the source of considerable litigation in the courts of this state, and is likely to recur until such time as it is addressed by the Florida Supreme Court, we grant the motion to certify a question of great public importance.
The property appraiser, Rick Barnett, and tax collector, Peggy Brannon, of Bay County, Florida (collectively, property appraiser), appeal a final judgment deciding that the real property on which the Bay Correctional Facility (facility) is located was immune from ad valorem property taxes because the Department of Management Services (DMS), the lessee under a lease-purchase agreement (LPA), was the property's equitable owner. As a consequence, the court directed the property appraiser to set aside the assessments he made for the taxable years 1999 through 2002. The Department cross-appeals the lower court's failure to declare the subject property immune from taxation since 1994, the date it asserts it first became the equitable owner of the property. We affirm *128 all issues, but address only those raised by appellants.
The facts, as stipulated by the parties, disclose that the Florida Legislature enacted the Correctional Privatization Commission Act, sections 957.01-957.16, Florida Statutes (1993), which was designed to privatize the operation of state prison facilities, and in order to accomplish that purpose, it created the Correctional Privatization Commission (CPC),[1] a public entity acting within DMS. § 957.03(1), Fla. Stat. (1993). In implementing the legislative goals, the Bay County Private Correctional Facility Finance Corporation (Finance Corporation),[2] a private, not-for-profit corporation, was created in 1994, for the purpose of acquiring the title to the property on which the facility would be located. Shortly thereafter the Panama City Port Authority transferred title of the real property to the Finance Corporation, which then leased the facility and its property to the CPC, pursuant to the terms of the LPA, which made the CPC responsible for providing all insurance, repairs and maintenance of the facility, and all risk of loss. Finally, under its terms, the CPC was given an option to purchase the facility and receive all the interests of the lessor upon expiration of the lease, with no further payment.
The Finance Corporation entered into a separate agreement with NationsBank of Florida, N.A., as trustee (Trustee), and it transferred its interest in the LPA to the Trustee. Pursuant to the agreement, the Trustee issued certificates of participation (COPs) to investors, the proceeds of which were used by the Finance Corporation to acquire the property on behalf of the CPC and to construct the facility. In order to secure the issuance of the COPs, the Finance Corporation mortgaged its interest in the property to the Trustee, and thereafter the CPC, the Finance Corporation, and the Correctional Corporation of America (CCA), a private corporation, entered into a contract for CCA to construct the correctional facility, and the CPC and CCA executed a separate contract for its operation. The state has appropriated funds to the CPC on an annual basis in an amount sufficient to pay the annual lease payments to the Trustee, as required by the LPA, and to pay the cost of operating the facility.
Thereafter, the property appraiser assessed both the real and personal property and placed them on the tax rolls for the years 1995-2002. In 1997, both the CPC and the Finance Corporation filed complaints challenging the assessments of the property for the years 1995-1997, which were dismissed. The CPC filed separate complaints challenging the assessment of the property for the tax years 1999-2002, which resulted in the final judgment appealed, declaring the property immune from ad valorem property taxation during the later years challenged.
The property appraiser first argues that the LPA, which is part of the financing arrangement used for the construction and operation of the prison facility, is precisely that, a lease, and not a mortgage; therefore, it could not legally transfer equitable ownership of the property to the CPC, and, because legal ownership to the property remained in a private entity, the Finance Corporation, the property could not be deemed immune from taxation. The appraiser alternatively argues that if, in fact, the lease had the effect of transferring equitable ownership to the CPC, its *129 legal effect was that of a mortgage given to secure the repayment of the debt evidenced by the mortgage the Finance Corporation conveyed to the Trustee; therefore, the repayment of the COPs for the purpose of satisfying the debt by state funds would have required compliance with the referendum provision of article VII, section 12 of the Florida Constitution, and because there was none, the debt was invalid. See Nohrr v. Brevard County Educ. Facilities Auth., 247 So.2d 304 (Fla. 1971). Finally, the appraiser argues that the legislature, in enacting the CPCA, reasonably intended that the contractor which operated the facility, CCA, would be the lessee of the property, not CPC; therefore, if equitable title was transferred, it was conveyed to CCA, a private entity, making the property subject to taxation. We cannot agree with any of these arguments.
In our judgment, the issue of the property's status is controlled by the Florida Supreme Court's decision in Leon County Educational Facilities Authority v. Hartsfield, 698 So.2d 526 (Fla.1997), wherein the court was asked whether property leased to the Leon County Educational Facilities Authority (LCEFA) from a non-profit entity under an LPA was subject to ad valorem taxes. Somewhat similar to the case at bar, SRH, Inc., a private, non-governmental entity, served as the lessor under the agreement, and in such capacity it was required to "acquire, construct, and equip the project and lease it to the Authority in exchange for periodic rental payments." Id. at 527. COPs were sold to finance the dormitory project and investors received a fractional interest in the rental payments made by the authority. Id. Once the certificates were fully paid, the Authority had the option under the lease of purchasing the dormitory project for $1.00. Id. The terms of the agreement also provided that the lessee, the Authority, "shall pay any taxes which may be assessed against the project." Id. After the property appraiser's denial of the authority's application for an ad valorem tax exemption, the Authority and SRH sought declaratory relief, and their complaint was dismissed, which was affirmed by this court on appeal for the reason that the property was not exempt because SRH, a private entity, rather than the public Authority, held legal title to the property. Id. at 527-28.
Applying the doctrine of equitable ownership, the Florida Supreme Court quashed this court's decision, concluding that the project was exempt from taxation because the Authority, a public entity, not SRH, was its equitable owner. Id. at 529. In so deciding, the court noted that the Authority held "virtually all the benefits and burdens of ownership." Id. at 530. Among other things, the court noted that the Authority was responsible for maintaining and insuring the project and, more to the point, it could purchase the project for a nominal sum upon termination of the lease. Id. at 527. In reaching its decision, the court emphasized the use of the property and the lack of benefits acquired by SRH under the lease:
It is unlikely that the legislature intended that property being used by the Authority for its authorized purpose should be denied a tax exemption solely because it does not hold bare legal title. The only reason legal title is held by SRH is to facilitate the financing of the project. In essence, SRH is a conduit through which the lease payments are used to repay the COPS holders. Under the lease, SRH can make no profit on the project.
Id. at 529. Despite the factual similarities between the Hartsfield financing arrangement and that in the present case, the *130 county argues that Hartsfield is not controlling.
The property appraiser fails to show how the occurrence of a bond validation proceeding would in the instant case have any impact upon a determination of equitable ownership, any more than such proceeding would have affected the determination in Hartsfield, in which no mention was made of the necessity of a referendum. The relative burdens and benefits flowing to the lessor and lessee are controlled in both cases by the financing arrangement and the LPA. In this case, the majority of the benefits and burdens of the prison ownership flow to the state, while virtually none are conveyed to CCA.
Although the property appraiser argues that the contractor, CCA, is the equitable owner of the prison facility due to the terms of an operation and management service contract between it and the CPC, in which CCA agreed to operate and manage the project and be responsible for all lawful taxes assessed on the property, this argument fails to acknowledge that CCA was not the lessee under the terms of the LPA, but rather CPC, and, indeed, CCA was not a party to the LPA. Similar to SRH, the non-profit corporation in Hartsfield which leased the project to the Authority, in the present case, the Finance Corporation, also a non-profit corporation, was established solely to facilitate the financing of the facility, and it, too, leased the property to a governmental agency. The Finance Corporation, like SRH, holds bare legal title to the property, and, although it mortgaged its interest in the property to the Trustee, it has no obligation to repay the funds secured by the issuance of the COPs to construct the facility under the terms of the mortgage if the legislature fails to appropriate sufficient amounts for such purpose. Moreover, as the lessor, the Finance Corporation collects none of the rent paid by the state under the agreement, as it has assigned its right to rental payments under the LPA to the Trustee, which in turn, are applied by the Trustee to the payment of principal and interest on the COPs. As a result, the Finance Corporation has obtained no burdens or benefits of ownership under the LPA.
While CCA had a stake in the construction and operation of the prison, its potential gains or losses were derived solely from its status as a contractor, and not as a tenant. The benefits it received were obtained under the terms of the operation and management service contract in its role as general contractor for the construction of the prison, and as a contract provider of correctional services, and not as a lessee. Thus, because it also had none of the benefits or burdens associated with owning the prison, it cannot be considered the property's equitable owner.
It is obvious, under the contractual terms, that only the state, operating through the CPC, can in fact occupy the status of equitable owner. Subject to annual appropriations, the CPC is ultimately responsible for repaying the COPs issued to construct the prison. Finally, following the final payment under the agreement, the concluding payment is "$0.00," and the Finance Corporation is then required to convey its fee-simple interest to the CPC. As a result, we consider the facts essentially indistinguishable from those in Hartsfield, and we agree with the lower court that the state, acting through the CPC, must be considered the equitable owner of the facility.
The property appraiser next argues that if the CPC has acquired such status, the state was constitutionally prohibited from entering into the agreement, because it constitutes a public debt without a referendum vote by the people. The decisions *131 that the property appraiser relies upon, State v. School Board of Sarasota County, 561 So.2d 549 (Fla.1990), and State v. Brevard County, 539 So.2d 461 (Fla.1989), offer little support for his argument. In each case, the supreme court found that a referendum was not constitutionally required to approve lease-purchase financing arrangements similar to those involved at bar, because the governmental entities did not secure their obligations with a pledge of ad valorem taxes, or a mortgage with the right of foreclosure. See Sarasota County, 561 So.2d at 553. In rejecting the argument that such a financing arrangement required a referendum, the court in Sarasota County concluded:
The state contends that County of Volusia v. State, 417 So.2d 968 (Fla. 1982), precludes validation in this instance. We disagree. In Volusia, the obligations were supported by the pledge of all legally available unencumbered revenues other than ad valorem taxation, along with a promise to fully maintain the programs and services which generated the non-ad valorem revenue. We held that referendum approval was required because the interrelated promises "in effect constitutes a promise to levy ad valorem taxes." Id. at 971. The instant case is not analogous. We have here no interrelated promises which will inevitably lead to an increase in ad valorem taxation.

The state in addition argues that validation is precluded by Nohrr v. Brevard County Educational Facilities Authority, 247 So.2d 304 (Fla.1971). In Nohrr, we held that a bond-supporting agreement which granted a mortgage with right of foreclosure violated the predecessor to article VII, section 12, absent an approving referendum. The rationale of Nohrr does not apply to the instant case. There is no mortgage with right of foreclosure. Here the bondholders are limited to lease remedies and the annual renewal option preserves the boards' full budgetary flexibility.

Id. at 553 (emphasis added) (footnote omitted). Moreover, the court did not hold that such a lease-purchase financing arrangement did not constitute debt. In fact, the court specifically recognized that governmental entities involved became debtors under the financing arrangement:
In the instant cases, likewise, the supporting agreementsthe facilities and ground leases and the trust agreementsare evidence of the boards' indebtedness. They constitute obligations of the boards, so long as funds are appropriated, to pay the designated revenues to the trustees to assist in servicing the bonds.
Id. at 552 (emphasis added).
In this case, the CPC is in the same position as that of the school boards in Sarasota County and the county in Brevard County. The CPC is indebted to the COP holders. As long as funds are annually appropriated, the CPC is required to make principal and interest payments on its debt. A default in the payments required under the mortgage would occur only if the state defaulted in the payments required by the LPA. Under such circumstances, the state would cease to be the equitable owner of the property; the Finance Corporation would become both its legal and equitable owner, and the Trustee could then pursue its remedies to enforce the mortgage against the Finance Corporation, not the CPC. As a result, the holders of the COPs are in no better position than the bondholders in State v. Miami Beach Redevelopment Agency, 392 So.2d 875, 898-99 (Fla.1980), to compel the state by judicial action, if the obligations of the debt represented by the COPs could not be fulfilled, to satisfy the indebtedness. *132 As a result, neither Sarasota County nor Brevard County provides support for the proposition that the CPC could not assume debt in the absence of a referendum.
The property appraiser next argues that in enacting chapter 957, the legislature intended that facilities constructed pursuant to such legislation would be subject to ad valorem taxation in their status as private prison facilities. Only by fixing on isolated portions of the legislation is the property appraiser able to reach such conclusion, one with which we cannot agree. Among other things, he points to section 957.03(1), requiring the CPC to enter into contracts with contractors for the purpose of designing, leasing, constructing and operating the facilities, and section 957.04(2)(c), designating the contractor, not the CPC, as the entity responsible for obtaining the financing necessary to design and construct the facility. This argument overlooks the fact that section 957.04(2)(a) authorizes the use of tax-exempt financing of the facilities through the issuance of tax-exempt bonds, COPs and LPAs.
A well-recognized maxim of statutory construction is that the legislature must be presumed to be aware, at the time it enacts new legislation, of the status of the law then existing, including pertinent judicial case law. Thus, when the legislature adopted chapter 957 in 1993, it was no doubt aware of the supreme court's decisions in Sarasota County and Brevard County, approving financing arrangements involving LPAs through the issuance of bonds or COPs which would be paid from sources that included ad valorem taxes, and that such arrangements did not require a public referendum. Any lingering uncertainty as to the legislative intent behind the creation of the Act was, in our opinion, clearly dispelled by the legislature's addition of subsection (8) to section 957.04 in 1999, which provides that the buildings and other improvements financed under subsection (2)(a) and leased to the CPC would, upon the expiration of the lease, become the property of the state.
Appellant seeks certification of a question to the Florida Supreme Court, and as grounds for certification of the question, he asserts that property appraisers have relied on section 957.07(2), Florida Statutes (2002-2005), in determining that the legislature had intended for privately financed, constructed, and operated prisons to be subject to ad valorem taxes in the same manner as those paid by other private commercial property owners. He cites section 957.07, Florida Statutes, which sets forth the cost-saving requirements that a successful private contractor must satisfy to be a successful bidder for a contract in the corporate operation of a prison facility. Subsection (2), of section 957.07, Florida Statutes (2005), provides:
(2) Reasonable projections of payments of any kind to the state or any political subdivision thereof for which the private entity would be liable because of its status as private rather than a public entity, including, but not limited to, corporate income and sales tax payments, shall be included as cost savings in all such determinations. In addition, the costs associated with the appointment and activities of each contract monitor shall be included in such determination.
Appellant urges the foregoing language evinces the legislative intent that privately operated prison facilities shall be subject to ad valorem taxation just as any other private commercial enterprise. Contrary to appellant's position, we conclude the quoted provision should be viewed merely as an indicator of legislative intent that, in making the cost-saving determination to qualify for a contract to operate a prison facility, a private contractor shall be allowed *133 a credit for any tax liability it would otherwise incur if it were operating a commercial enterprise, rather than a government facility. That is, in the cost-saving determination for purposes of an award of the contract, the private contractor is allowed a credit for costs for which the state is exempt. Carried to its logical conclusion, the subsection in our opinion supports the lower court's judgment that the state is the equitable owner of the property; thus the property is immune from ad valorem taxation.
Nevertheless, because the question is a frequent subject of litigation in our state's courts, we deem appellant has stated a reasonable basis for certification. Therefore, pursuant to Florida Rule of Appellate Procedure 9.030(a)(2)(A)(v), we certify the following as a question of great public importance:
WHETHER, IN ENACTING CHAPTER 957, FLORIDA STATUTES, THE LEGISLATURE INTENDED THAT PRISON FACILITIES CONSTRUCTED AND OPERATED BY PRIVATE CONTRACTORS AND LEASED TO THE STATE UNDER A LEASE-PURCHASE AGREEMENT SHALL BE SUBJECT TO AD VALOREM TAXES?
AFFIRMED.
WOLF and DAVIS, JJ., concur.
NOTES
[1] The authority of the CPC to so act was transferred to DMS on July 1, 2004.
[2] In 2001, the Finance Corporation merged into Florida Correctional Finance Corporation.
[1] The authority of the CPC to so act was transferred to DMS on July 1, 2004.
[2] In 2001, the Finance Corporation merged into Florida Correctional Finance Corporation.