461 So.2d 72 (1984)
J. Robert ROWE, Appellant,
v.
PINELLAS SPORTS AUTHORITY, et al., Appellees.
PINELLAS RESORT ORGANIZATION, INC., et al., Appellants,
v.
PINELLAS SPORTS AUTHORITY, et al., Appellees.
Nos. 65322, 65420.
Supreme Court of Florida.
November 9, 1984.
Rehearing Denied November 21, 1984.
*73 George H. Bailey of Jones & Foster, West Palm Beach, for J. Robert Rowe; and Gerald F. Richman and Bruce A. Christensen of Floyd, Pearson, Richman, Greer, Weil, Zack & Brumbaugh, Miami, for Pinellas Resort Organization, Inc.
Julian Clarkson, C. Lawrence Stagg and Dennis R. Ferguson of Holland & Knight, Tallahassee, Van B. Cook, Asst. County Atty., Clearwater, and Michael S. Davis, City Atty., St. Petersburg, for Pinellas Sports Authority, Pinellas County and City *74 of St. Petersburg; and Jim Smith, Atty. Gen. and J. Terrell Williams, Asst. Atty. Gen., Tallahassee, for State of Florida, Department of Revenue.
ADKINS, Justice.
These are consolidated appeals from a final judgment entered by the Circuit Court of Pinellas County validating revenue bonds to be used to finance a sports stadium. We have jurisdiction. Art. V, § 3(b)(2), (7), Fla. Const.
In 1977 the Florida legislature enacted what is now section 125.0104, Florida Statutes (1983), the "Local Option Tourist Development Act." This statute authorizes Florida's counties, after referendum to levy a tourist development tax, to be used for certain enumerated purposes.
Pursuant to its statutory authorization, in 1978 Pinellas County, after a referendum, adopted ordinance 78-20. Section 2 of that ordinance set forth the "tourist development plan" whereby all receipts from the tax were to be placed in a trust fund "to be used exclusively for tourist advertising and promotion for Pinellas County and its committees." Section 3 of the ordinance, not a part of the tourist development plan, provided that all or any portion of the tax revenues might be pledged by the Board of County Commissioners to secure revenue bonds issued for certain projects, including "convention centers, sports arenas, sports stadiums, coliseums, or auditoriums."
In 1982 ordinance 82-19 was enacted which amended ordinance 78-20. The amended ordinance expanded the tourist development plan (section 2) of the first ordinance to include purposes other than "tourist advertising and promotion," specifically, the construction of sports stadiums.
In November 1983 the Board of County Commissioners adopted a resolution authorizing the Pinellas Sports Authority to proceed with development of a bond issue to finance the stadium. On December 20, 1983, Pinellas Sports Authority [hereinafter PSA], the City of St. Petersburg [hereinafter city], and Pinellas County [hereinafter county] entered into an Interlocal Agreement to cooperate in the acquisition, construction and financing of the stadium. The Interlocal Agreement called for the PSA to issue revenue bonds. The city committed to pay a portion of the debt service on the bonds from the proceeds derived by the city from its excise taxes. The city's excise taxes consist of guaranteed entitlement funds and sales tax.
The adoption of the Interlocal Agreement prompted legal action by the Pinellas Resort Organization Holiday House Motel-Apts, Inc., Harold E. Slaughter and William A. Tolliver in the form of an action seeking declaratory and injunctive relief. A bond validation proceeding was concurrently brought by PSA, the county and the city. The trial judge consolidated the two cases for trial and ultimately for appeal to this Court. After trial, the judge entered a final judgment of validation.
Before proceeding to the merits of this action, we will briefly address jurisdiction. Two actions involving these bonds were filed in the circuit court  an action seeking declaratory relief and a bond validation proceeding. The circuit court judge entered an order consolidating the two cases. There is no question of our jurisdiction over the bond validation proceedings. Art. V, § 3(b)(2), Fla. Const. And since many of the same issues are involved in the declaratory relief action, it is necessary and proper to the complete exercise of our jurisdiction that we dispose of these common issues at one time. Therefore, as we are authorized to do by our constitution, we accept jurisdiction in the declaratory relief action. Art. V, § 3(b)(7), Fla. Const. See also Mize v. County of Seminole, 229 So.2d 841 (Fla. 1969).
On the merits, appellants argue that a number of infirmities in the issuance process should prevent the validation of these bonds. Chief among these are alleged violations of the Florida Sunshine Law, section 286.011(1), Florida Statutes (1983). This law provides:

*75 All meetings of any board or commission of any state agency or authority or of any agency or authority of any county, municipal corporation or political subdivision, except as otherwise provided in the Constitution, at which official acts are to be taken are declared to be public meetings open to the public at all times, and no resolution, rule or formal action shall be considered binding except as taken or made at such meeting.
Id. (emphasis supplied).
The applicable language of the statute states that meetings of "an agency or authority ... of a political subdivision" are subject to the requirements of the Sunshine Act. The record shows, however, that no meetings involving these bonds occurred with two or more members of any one of the three governmental entities present. We do not construe that language to apply to the gatherings here between individual members and staff of the different governmental entities. By definition, then, no violation of the law occurred. There was never any meeting where any two individuals with decision-making capacity were present. The individuals could only report back to their respective governmental bodies. The subsequent discussions and decisions of all three of the governing bodies took place in open, public meetings. Appellants' reliance on Wood v. Marston, 442 So.2d 934 (Fla. 1983), is misplaced. In that case we held that the search-and-screen committee was clearly a "board or commission" of a state agency subject to the Sunshine Law.
Even if we were to include the gatherings that occurred here under the definition of the Sunshine Law, these gatherings do not rise to the level of decision-making which is required to violate the act. The record does show that some private discussions occurred where the stadium financing was mentioned. However, since no two individuals who were members of the same governing body were present at any one of these discussions, no decision-making official acts could occur that would violate the act.
Appellants also contend that the original ordinance, the referendum, and the amended ordinance were rendered invalid because the statutory requirements of the Tourist Development Act were not complied with. First, appellants contend that the initial Ordinance 78-20 is invalid because it allegedly does not comply with the requirements of the statute. In permitting Florida counties to levy a Tourist Development Tax, section 125.0104(4)(a), Florida Statutes (1983), provides in pertinent part:
(a) The tourist development tax shall be levied and imposed pursuant to an ordinance containing the county tourist development plan prescribed under paragraph (c), enacted by the governing board of the county. The ordinance levying and imposing the tourist development tax shall not be effective unless the electors of the county or the electors in the sub-county special district in which the tax is to be levied approve the ordinance authorizing the levy and imposition of the tax, in accordance with section (6).
The statute further prescribes certain requisites for the ordinance levying the tax in sections 125.0104(4)(b) and (c):
(b) At least 60 days prior to the enactment of the ordinance levying the tax, the governing board of the county shall adopt a resolution establishing and appointing the members of the county tourist development council, as prescribed in paragraph (e), and indicating the intention of the county to consider the enactment of an ordinance levying and imposing the tourist development tax.
(c) Prior to the enactment of the ordinance levying and imposing the tax, the county tourist development council shall prepare and submit to the governing board of the county for its approval a plan for tourist development. The plan shall set forth the anticipated net tourist development tax revenue to be derived by the county for the 24 months following the levy of the tax; the tax district in which the tourist development tax is proposed; and a list, in the order of priority, *76 of the proposed uses of the said tax revenue by specific project or special use as the same are authorized under subsection (5). The plan shall include the approximate cost or expense allocation for each specific project or special use.
The pertinent portions of Pinellas Ordinance 78-20 are as follows:
Section 2. The tax revenues received pursuant to this ordinance shall be used to fund the Pinellas County Tourist Development Plan, which is hereby adopted as follows:
TOURIST DEVELOPMENT PLAN
The anticipated annual revenue for a two percent (2%) tourist development tax for all of Pinellas County over a 24 month period is $4.8 million, less costs of administration as retained by the Department of Revenue, State of Florida. The tourist development tax for Pinellas County is to strengthen our local economy and increase employment by investing the total receipts of the tourist development tax into a trust fund to be used exclusively for tourist advertising and promotion for Pinellas County and its communities.
Section 3. All or any portion of the revenues raised by the tax hereby levied may be pledged by the Board of County commissioners to secure and liquidate revenue bonds issued by the county for the acquisition, construction, extension, enlargement, remodeling, repair, improvement, maintenance, operation or promotion of one or more publicly owned and operated convention centers, sports arenas, sports stadiums, coliseums or auditoriums within the boundaries of Pinellas County which projects are set forth within this ordinance or may be hereinafter adopted by appropriate amendment to this ordinance, as one of the uses to be made of the tourist development tax hereby levied.
We hold that ordinance 78-20 fully complies with the statute's mandates. The preamble to ordinance 78-20 recites that the Pinellas County Board of County Commissioners adopted a resolution in 1977 establishing and appointing the members of the Pinellas County Tourist Development Council. The record shows that prior to the enactment of the ordinance, at a public hearing, the Tourist Development Council presented its plan for tourist development to the commission. Further, the plan itself includes an estimate that tourist development tax revenues for 24 months will be $4.8 million. And, the plan requires "investing the total receipts" in a trust fund "to be used exclusively for tourist advertising and promotion for Pinellas County and its communities." A reasonable interpretation of this language, and appellants concede as much, is that it requires the entire estimated $4.8 million to be spent on one special use, tourist advertising and promotion. Nevertheless, appellants argue that the ordinance is infirm because section 3 of the ordinance is in conflict with section 2 because it permits use of the revenues to be pledged, inter alia, for construction of a sports complex. We agree with appellees' contention that construction of a sport stadium can be included in the term "tourist advertising and promotion." Nevertheless, we now hold that section 2 is complete within itself.
Appellants also argue that the ballot question presented to the voters did not apprise the voters that a stadium project could be the subject of the tourist tax revenues. The Board of County Commissioners certified the passage of the following ballot question regarding ordinance 78-20:
Shall Pinellas County Ordinance No. 78-20 be approved? This ordinance levies and imposes a countywide two (2%) percent tourist development tax on each whole or major fraction of each dollar of the total rental charge for the lease or rental of any tourist accomodations or living quarters for a term of six (6) months or less. Such tax shall be used to promote and develop the tourist industry in Pinellas County.
Florida law does not require that every substantive provision of a proposed *77 ordinance be reflected on a referendum ballot. All that is required is that the voters be given fair notice of the question to be decided. This Court so stated in Hill v. Milander, 72 So.2d 796, 798 (Fla. 1954):
It is a matter of common knowledge that many weeks are consumed, in advance of elections, apprising the electorate of the issues to be determined and that in this day and age of radio, television, newspaper and the many other means of communicating and disseminating information, it is idle to argue that every proposition on a ballot must appear at great and undue length.
Before this election, the full text of the ordinance had been advertised and debated at a public hearing called to consider it.
In Miami Dolphins Ltd. v. Metropolitan Dade County, 394 So.2d 981 (Fla. 1981), a case involving a challenge to a tourist development tax referendum held in Dade County under the statute here involved, this Court quoted the foregoing language from Hill v. Milander with approval, after first saying:
While there certainly are many details of the plan not explained on the ballot, we do not require that every aspect of a proposal be explained in the voting booth.
394 So.2d at 987. The Pinellas County ballot sufficiently complied with the express requirements of the Tourist Development Act and with the Court's previous holdings.
Appellants also argue that amended ordinance 82-19 is invalid because it was not submitted to a referendum of Pinellas County voters as was the initial ordinance. However, there is no requirement in the Tourist Development Act that a referendum be held to ratify an amendment. The statutory requirement for subsequent amendments to a tourist development plan is stated in section 125.0104(4)(d):
After enactment of the ordinance levying and imposing the tax, the plan of tourist development may not be substantially amended except by ordinance enacted by an affirmative vote of a majority plus one additional member of the governing board.
Additionally, section 3 of the ordinance itself provided that the revenues could be used for certain enumerated purposes or others "hereinafter adopted by appropriate amendment to this ordinance." The record shows that at the public hearing held in July, 1982, the four commissioners present voted unanimously in favor of the amendment, providing the "super-majority" required by both the Tourist Development Act and the ordinance itself. Therefore, amended ordinance 82-19 was validly enacted.
Appellants also contend that Pinellas County's tourist development tax revenues may not be pledged to pay off bonds that have been issued by another governmental entity, in this case, the PSA. However, section 8(c) of the PSA charter, chapter 77-635, Laws of Florida, provides that the county is authorized
to enter into cooperative agreements with the authority non ad valorem moneys of county ... to the payment of ... debt service costs ... or any part thereof of the authority while bonds issued by the authority.
The PSA charter empowers the county to pledge non-ad valorem moneys of the county, including tourist development tax revenues, to the payment of obligations issued by the Pinellas Sports Authority.
When a special act (such as the PSA charter) and a general law conflict, the special act will prevail. State ex rel. Johnson v. Vizzini, 227 So.2d 205 (Fla. 1969). Because section 8(c) of the PSA charter was enacted by subsequent special act, the authority for the pledging of tourist development tax revenues by the county to secure obligations issued by the PSA controls over any limitation imposed upon such a pledge by section 125.0104(5), Florida Statutes (1983).
Appellant Rowe also contends that article VII, section 12, of the Florida Constitution requires that a referendum be *78 held to validate this bond issue because the Interlocal Agreement contains a contingent contractual commitment by the city to impose a minimum ad valorem tax. We do not agree that a referendum was required in this instance.
The city pledged proceeds from its guaranteed entitlement funds and sales tax to secure its obligations under the Interlocal Agreement. Section 218.23, Florida Statutes (1983), specifies the requirements which must be fulfilled by the city for it to be eligible to receive the guaranteed entitlement funds in any fiscal year. The statute requires that the city shall have:
Levied ... ad valorem taxes, exclusive of taxes levied for debt service or other special millages authorized by the voters, to produce the revenue equivalent to a millage rate of 3 mills on the dollar based on the 1973 taxable values ... or, in order to produce revenue equivalent to that which would otherwise be produced by such 3-mill ad valorem tax, to have received a remittance from the county pursuant to s. 125.01(6)(a), collected on occupational license tax or a utility tax, levied an ad valorem tax, or received revenue from any combination of these four sources... . This paragraph requires only a minimum amount of revenue to be raised from the ad valorem tax, the occupational license tax, and the utility tax. It does not require a minimum millage rate.

§ 218.23(1)(c), Florida Statutes (1983) (emphasis added).
The statute, then, merely requires that a specified amount of revenue be collected from any combination of utility tax, occupational license tax, or ad valorem tax. Under this statute, the city has the option to establish its eligibility to receive the guaranteed entitlement funds without regard to any ad valorem levy. The record shows that the city has complied with that eligibility requirement. The covenant by the city to remain eligible to receive the guaranteed entitlement funds in no way legally obligates the city to levy a minimum ad valorem tax. The city's covenant is merely to remain eligible to receive guaranteed entitlement funds. No contractual obligation to levy an ad valorem tax exists.
No pledge of non-ad valorem revenue necessarily requires the imposition of an ad valorem tax here. All that is necessarily required by the Interlocal Agreement is the collection of sufficient revenue from among the alternative sources permitted by the statute. For this reason, the case is distinguishable from County of Volusia v. State, 417 So.2d 968 (Fla. 1982); and State v. Halifax Hospital District, 159 So.2d 231 (Fla. 1963), the two cases upon which appellant relies. There is only an incidental effect on use of the ad valorem taxing power occasioned by the pledging of the sources of revenue here. See City of Palatka v. State, 440 So.2d 1271 (Fla. 1983); Jacksonville Shipyards, Inc. v. Jacksonville Electric Authority, 419 So.2d 1092 (Fla. 1982); State v. Alachua County, 335 So.2d 554 (Fla. 1976); Town of Medley v. State, 162 So.2d 257 (Fla. 1964).
Appellants lastly contend that Florida's tourist development tax violates the equal protection clause of the Florida Constitution because it does not expressly include cooperatives in the statutory taxing scheme. This tax has been previously upheld against constitutional attack by this Court in Miami Dolphins. Appellants have not met their burden of showing that this classification is not reasonably related to some legitimate legislative purpose. Matthews v. Lucas, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976).
Finally, there is no merit to appellants' argument that the final judgment of the trial court does not contain ample findings and conclusions to support validation of the bonds.
Accordingly, the judgment of the trial court validating these bonds is affirmed.
It is so ordered.
BOYD, C.J., and OVERTON, ALDERMAN, McDONALD, EHRLICH and SHAW, JJ., concur.