831 So.2d 662 (2002)
PANAMA CITY BEACH COMMUNITY REDEVELOPMENT AGENCY, Appellant,
v.
STATE of Florida, et al., Appellee.
No. SC02-145.
Supreme Court of Florida.
October 17, 2002.
*663 Randall W. Hanna, Mark G. Lawson, Michael S. Davis, and Kenneth A. Guckenberger of Bryant, Miller and Olive, P.A., Tallahassee, FL, for Appellant.
William A. Lewis, Assistant State Attorney, Panama City, FL, for Appellee.
Jeffrey P. Whitton, Panama City, FL, for William Hendrick, Appellee/Intervenor.
LEWIS, J.
The Panama City Beach Community Redevelopment Agency entered this appeal seeking review of a circuit court judgment denying validation of a proposed bond issue. We have jurisdiction under article V, section 3(b)(2) of the Florida Constitution.

Facts and Procedural History
In 1998, the City of Panama City Beach ("City") approached the St. Joe Company ("St.Joe") regarding possible plans to embark upon an aggressive redevelopment of the City's parks and recreation facilities located near the center point of the City's major beachfront roadway, Front Beach Road.[1] St. Joe owned the real property which adjoined and separated portions of the City's parcels. In essence, the City sought to consolidate a large land area under its ownership to join and redevelop its land holdings in the areathe land commonly referred to as its fairgrounds facility (Aaron Bessant Park), and athletic fields (Frank Brown Park).
As part of an ongoing redevelopment effort, the City formally entered into a Memorandum of Understanding with St. Joe Company on March 10, 2000,[2] and moved to acquire a parcel of property adjacent to the fairgrounds owned by a third party. On November 30, 2000, the Panama City Beach City Council convened to discuss and determine its goals with regard to the proposed redevelopment. At this meeting, the City's assistant city manager, with the assistance of an attorney the City retained as special counsel for the redevelopment effort, summarized the problems and goals associated with the portion of the City that would become the Community Redevelopment Area. Following a fairly extended discussion of the City's redevelopment plans, the council adopted Resolution 00-23, in which it created the Community Redevelopment Agency ("CRA"), and legislatively determined that the redevelopment area was "blighted" within the definition of section 163.340(8), Florida Statutes (2000).
Subsequently, the CRA produced a Community Redevelopment Plan, which was adopted by the city council and CRA[3] in Resolution 01-09, as amended by Resolution 01-43. In January 2001, the City advertised for the disposition of certain *664 land interests within the redevelopment area held by the City, and for proposals for the development of the area. St. Joe was the only respondent, and its plan to develop the land was approved. In March 2001, the City held public hearings and established a redevelopment trust fund for the redevelopment area through enactment of Ordinance Number 717.
In September 2001, the City, the Pier Park Community Development District, and the CRA entered into an interlocal agreement, denominated the Public Improvement Partnership Agreement, for the purpose of developing the redevelopment area in conformity with the redevelopment plan. Among the provisions of the agreement were sections calling for the issuance of revenue bonds by the district. Pursuant to chapter 190, Florida Statutes (2000), the City, the district, and the CRA sought validation of the partnership agreement, a decision on the legality of each plaintiff entering into the agreement, and the issuance of the bonds in the Circuit Court of the Fourteenth Judicial Circuit in Bay County.
Following the State Attorney's answer and agreement with the plaintiffs in a joint stipulation,[4] the trial court scheduled an initial hearing and a subsequent evidentiary hearing regarding the City's findings of blight within the redevelopment area. Following the second hearing, the court issued its final judgment, in which it validated the entirety of the interlocal agreement but declared invalid the revenue bonds that the district planned to issue. In its order, the trial court reasoned:
The Re-development Act was intended to provide for the rehabilitation of previously built-upon properties that have outlived their usefulness and are so economically impaired that no-one is interested in rehabilitating them; the cost of leveling the property and of putting in new infrastructure and buildings would be too much, particularly in urban areas of decay.
. . . .
The law should not be at war with common sense. The Court has tried mightily to reconcile the stated purpose of the Redevelopment Act with the facts before it. But when the Court places the evidence alongside the Actand reads all of itit is plain that the District does not qualify for re-development. It has never been developed! By and large it is vacant land begging to be built on.
The Plaintiffs' desire to extract a few words from the Act and apply them to the District, irrespective of the obvious purpose of the Act, leads to an absurdity. The Redevelopment Act does not apply. The request for validation must be and is denied.
Pier Park Cmty. Dev. Dist. v. State, No. 03-2001-CA-3463-J (Fla. 14th Cir.Ct. Dec. 7, 2001). This timely appeal followed.

Analysis
The issue before us today is the appellant's contention that the trial court improperly substituted its judgment for that of the city council with regard to the propriety of developing the redevelopment area. The CRA asserts that in declaring the City's determination of blight to be unfounded and without justification, the trial court ignored well-settled Florida law which holds that legislative findings by local governments may be overturned only when they are determined to be clearly *665 erroneous. In effect, the appellant argues, the trial court fixated upon the fact that portions of the redevelopment area are undevelopeda consideration entirely beyond the scope of the trial court's review in this bond validation proceeding-due to an erroneous interpretation of the applicable statutes. Therefore, it is asserted that the trial court erred by independently examining the merits of the City's redevelopment plan.
It is clear that this Court's review of the trial court's conclusions of law is de novo. See JFR Investment v. Delray Beach Cmty. Redevelopment Agency, 652 So.2d 1261, 1262 (Fla. 4th DCA 1995). Indeed, a concrete example of such de novo review is this Court's recent decision in Boschen v. City of Clearwater, 777 So.2d 958 (Fla.2001). While the factual setting we analyzed in Boschen differs from the instant case because "[a] final judgment validating bonds comes to this Court with a presumption of correctness," id. at 962, the comprehensive inquiry performed by this Court in Boschen reveals that we thoroughly examined all of the legal conclusions rendered by the trial court. For example, this Court both "determine[d] whether the evidence presented at the validation hearing supported the trial court's validation of the bonds," and examined whether sufficient evidence existed in the record to "demonstrate[] that the overall project promotes public health and safety." Id. at 966, 968.
In stark contrast to this Court's standard of review in validation proceedings, the decisions of this Court also clearly mandate that trial courts must maintain a very deferential standard of review when testing the validity of statutorily authorized revenue bonds. In Boschen, this Court stated:
Generally, "legislative declarations of public purpose are presumed valid and should be considered correct unless patently erroneous." Moreover, the wisdom or desirability of a bond issue is not a matter for our consideration. Indeed, we have recognized that so long as the Legislature does not exceed its constitutional authority, our review of legislative declarations is limited.
777 So.2d at 966 (citations omitted). Additionally, "questions concerning the financial and economic feasibility of a proposed plan are to be resolved at the executive or administrative level and are beyond the scope of judicial review in a validation proceeding." State v. City of Daytona Beach, 431 So.2d 981, 983 (Fla.1983). Thus, only where the legislative determinations and conclusions are clearly erroneous should a court refuse to validate the bond issue.
In its Final Judgment and Supplemental Final Judgment, the trial court made clear that it fully validated the creation and powers of the Community Redevelopment Agency and approved the interlocal agreement and redevelopment plans. The court only disapproved the issuance of bonds based upon its analysis and conclusions regarding the impropriety of the City's findings of "blight" within the redevelopment area. For this reason, this Court's standard full inquiry into whether (1) the public body has the authority to issue bonds, (2) the purpose of the obligation is legal, and (3) the bond issuance complies with the requirements of the law, see State v. Osceola County, 752 So.2d 530, 533 (Fla. 1999); Poe v. Hillsborough County, 695 So.2d 672, 675 (Fla.1997), is not necessary. Because the trial court narrowly defined its reason for refusing to validate the bond issuance, we need only examine the first condition.
Codified in chapter 163 of the Florida Statutes, the Community Redevelopment Act of 1969 details the various measures *666 which must be taken by localities desiring to create redevelopment agencies, declare redevelopment areas, and issue revenue bonds to finance projects within these areas. Germane to the instant case is section 163.385(1)(a), which states:
When authorized or approved by resolution or ordinance of the governing body, a county, municipality, or community redevelopment agency has the power in its corporate capacity, in its discretion, to issue redevelopment revenue bonds from time to time to finance the undertaking of any community redevelopment under this part....
§ 163.385(1)(a), Fla. Stat. (2001). "Community redevelopment" is defined as including "undertakings, activities, or projects... in a community redevelopment area for the elimination and prevention of the development or spread of slums and blight." § 163.340(9), Fla. Stat. (2001). Finally, the Legislature defined "blighted area" as either:
(a) An area in which there are a substantial number of slum, deteriorated, or deteriorating structures and conditions that lead to economic distress or endanger life or property by fire or other causes or one or more of the following factors that substantially impairs or arrests the sound growth of a county or municipality and is a menace to the public health, safety, morals, or welfare in its present condition and use:
1. Predominance of defective or inadequate street layout;
2. Faulty lot layout in relation to size, adequacy, accessibility or usefulness;
3. Unsanitary or unsafe conditions;
4. Deterioration of site or other improvements;
5. Inadequate and outdated building density patterns;
6. Tax or special assessment delinquency exceeding the fair value of the land;
7. Inadequate transportation and parking facilities; and
8. Diversity of ownership or defective or unusual conditions of title which prevent the free alienability of land within the deteriorated or hazardous area; or

(b) An area in which there exists faulty or inadequate street layout; inadequate parking facilities; or roadways, bridges, or public transportation facilities incapable of handling the volume of traffic flow into or through the area, either at present or following proposed construction.
§ 163.340(8), Fla. Stat. (2001) (emphasis supplied). Thus, as the trial court noted, the CRA only has the authority to issue revenue bonds if the funds derived therefrom are to be used to alleviate "blight."
In City of Panama City Beach Resolution 00-23, the city council specifically found:
Within the Redevelopment Area there exists faulty or inadequate street layout; inadequate parking or parking facilities; or roadways or other public transportation facilities incapable of handling the volume of traffic flows into or through the area, either at present or following substantial improvement within the area. The Redevelopment Area suffers from a predominance of defective or inadequate street layout, aging infrastructure and design, and deterioration of site or other improvements.
The City Council hereby finds that one or more slum or blighted areas exist within the Redevelopment Area, and that the rehabilitation, conservation, or redevelopment, or a combination thereof, of such Redevelopment Area is necessary in the interest of the public *667 health, safety, morals, or welfare of the residents of the City.
City of Panama City Beach Res. 00-23 (2000). Under Florida case law, the trial court should have simply examined these legislative findings to determine whether they were "patently erroneous." See Boschen, 777 So.2d at 966. Indeed, legislative determinations are entitled to a presumption of correctness and should be upheld if supported by competent, substantial evidence in the record. See City of Winter Springs v. State, 776 So.2d 255, 261-62 (Fla.2001). Thus, this Court must examine the record to determine whether the City had a reasonable basis for concluding that portions of the redevelopment area are blighted as that term has been defined by our Legislature.
It is not necessary that this Court detail the entirety of evidence contained in the record which supports the City's declaration of blight. It is clear, however, that a great quantity of information which supports the City's conclusions in the instant case was before this legislative body when it made its determinations. Indeed, at the city council session during which Resolution 00-23 was adopted, the City's attorney for the redevelopment project specifically informed the members of the legislative determination they were required to make:
Important to looking at the redevelopment areastatutory schemeis this governing body's determination that the redevelopment area is subject to the terms "slum" or "blight." We're not dealing with the legal term "slum" here. We're really dealing with the term "blight" and that goes to the lack of adequate infrastructure, the lack of a transportation system, the make up of parcels in a specific area that are all conducive to a redevelopment initiative or exercise. In a few minutes I'm going to go over the findings necessary to determine blight and I'm going to have a discussion with your Assistant Manager, Mr. Pickle, that will serve as a form of testimony to demonstrate record information that I would say you hold self evident in this community. It will be a description of the make up of this parcel. It'll be a description of ownership. It'll be a description of what exists and what doesn't exist on the parcel today and that will allow you to have a factual backdrop to ultimately consider a finding contained in the resolution.
Subsequent to this introduction, the city council heard the testimony of Assistant City Manager Dennis Pickle, who related the various transportation and maintenance difficulties currently associated with the redevelopment area. At a later date, the City detailed the poor traffic and safety conditions within its community redevelopment plan, which concluded by stating:
Together, fragmented ownership, poor traffic circulation, parking constraints, and physical and economic degradationa series of interconnected conditionshave effectively created an environment of blight within the Study Area.
The crux of that which transpired before the Panama City Beach City Council was perhaps best summarized by Lee Sullivan, the city's mayor, during the evidentiary hearing before the trial court:
Well, I believe that [the redevelopment area] is a bad place, and that it has problems, and I know what the problems are through my experience. And then I had an opportunity, as I said, as Mayor, and listened to the process and had the explanation done about the statutory issues to understand, at least as I sat there, that it qualified to meet the statutory definition. So I, you know I, yes. I believe that it meets ... I heard you explain the statutes time after time after time. I've heard that explanation *668 so that I and the counsel [sic] clearly understood that not only were the issues of finding [blight], but once you had issues of finding you had to have a direct issue and how to solve what you had found.
It is clear that when the city council adopted Resolution 00-23 finding that the redevelopment area was blighted, the members had before them competent evidence in support of this conclusion. The council relied upon their own knowledge of the area in question, the informed opinions of experts, and a significant amount of testimonial evidence regarding the state of the redevelopment area-particularly with regard to the roadways and concomitant safety issues-in concluding that the area was blighted under section 163.340(8) of the Florida Statutes. As was the situation in City of Winter Springs v. State, a review of the record "yields competent, substantial evidence to support the City's determination." 776 So.2d at 261.
Certainly, the evidence before the city council which revealed and outlined the transportation, vagrancy, and sanitation problems within the redevelopment area supports a finding of blight under section 163.340(8) of the Florida Statutes. As defined in this statutory section, a blighted area is properly found where a "predominance of defective or inadequate street layout," "unsanitary or unsafe conditions," or "inadequate transportation and parking facilities" "substantially impairs or arrests the sound growth of a county or municipality and is a menace to the public health, safety, morals, or welfare." § 163.340(8)(a), Fla. Stat. (2001). Additionally, section 163.340(8)(b) authorizes the finding of blight in "[a]n area in which there exists faulty or inadequate street layout; inadequate parking facilities; or roadways, bridges, or public transportation facilities incapable of handling the volume of traffic flow into or through the area, either at present or following proposed construction." § 163.340(8)(b), Fla. Stat. (2001) (emphasis supplied). Especially as related by Mayor Sullivan and the experts at the hearing before the trial court, the evidence before the city council and the council's explicit findings fulfill the statutory requirements for blight set forth in either (a) or (b) of section 163.340(8).
The trial court's conclusion that undeveloped land can never qualify as blighted under chapter 163 is erroneous, because section 163.360(8) clearly provides for the acquisition and redevelopment of "open land." See § 163.360(8), Fla. Stat. (2001) ("If the community redevelopment area consists of an area of open land to be acquired by the county or municipality...."). It is apparent that the trial court viewed the applicable statutory provisions through a prism of "redevelopment" with somewhat more restrictive parameters than those actually set forth by the Legislature. While one may very logically reason, as did the trial court, that the concept of "redevelopment" should have a direct nexus to that which has previously been "developed," the controlling statutory provisions are not so limited. Although the statutory scheme does, in part, contemplate action directed toward prior development that has fallen into decay, the breadth of the statutory scheme also specifically encompasses action that may be directed toward open land. The definition of "blighted area" under section 163.340(8)(a) seems to contemplate some form of building development in the area, as it describes: "An area in which there are a substantial number of slum, deteriorated, or deteriorating structures and conditions that lead to economic distress...." § 163.340(8)(a), Fla. Stat. (2001) (emphasis supplied). However, section 163.340(8)(b) is not so limiting, is separated *669 in the context of the disjunctives "either" and "or," and is expansive without reference to the prior development with structures as it provides a "blighted area" also means: "An area in which there exists faulty or inadequate street layout; inadequate parking facilities; or roadways, bridges, or public transportation facilities incapable of handling the volume of traffic flow into or through the area, either at present or following proposed construction." § 163.340(8)(b), Fla. Stat. (2001).
Any doubt with regard to whether open or vacant land may be included within the area of redevelopment is resolved by consideration of section 163.360(8) of the Florida Statutes, which clearly contemplates the inclusion of such land and provides restrictions concerning its acquisition. See § 163.360(8), Fla. Stat. (2001) (providing separate and differing requirements for the acquisition of land, depending upon the residential or nonresidential use for which the property will be utilized).
In the face of basically unrefuted evidence detailing the information upon which the city council based its conclusion that the redevelopment area is "blighted," the trial court concluded that "it is difficult to imagine that the evidence before the City met any accepted definition of blight." Pier Park Cmty. Dev. Dist. v. State, No. 03-2001-CA-3463-J (Fla. 14th Cir.Ct. Dec. 7, 2001). However, because the city council's determination that the redevelopment area is blighted was a legislative function, Florida law requires that this action "be sustained as long as [it was] fairly debatable." Board of County Comm'rs of Brevard County v. Snyder, 627 So.2d 469, 474 (Fla.1993); see also Pepin v. Div. of Bond Finance, 493 So.2d 1013, 1014 (Fla.1986) (holding that "legislative declarations of public purpose are presumed valid and should be considered correct unless patently erroneous"); State v. Housing Finance Auth. of Polk County, 376 So.2d 1158, 1160 (Fla.1979). While the City Council cannot simply label an area "blighted" and make it so, see, e.g., City of Jacksonville v. Moman, 290 So.2d 105, 107 (Fla. 1st DCA 1974) ("The city may designate an area as a slum, but such designation does not make it a slum."), the wealth of information before the city council and knowledge possessed by its members certainly make the issue of blight "fairly debatable." As discussed above, after examining competent, substantial evidence, the city council properly determined that the subject property was within the statutory definition of "blight." On this evidence, the city council's conclusion that the redevelopment area is blighted is not clearly or patently erroneous.
Here, the trial court did not give the city council's legislative determinations the proper deference mandated by well settled Florida law. Indeed, the trial court's final judgment is strikingly similar to the determination this Court addressed in City of Winter Springs: "By substituting its own judgment for that of the locally elected officials, and thus failing to attach a presumption of correctness to the legislative determination, the trial court erred as a matter of law." 776 So.2d at 258. The trial court failed to properly defer to the city council's findings under a correct statutory application; therefore, its judgment must be reversed.

Conclusion
Based upon the foregoing, we reverse the final judgment of the trial court, and remand this cause for further bond validation proceedings consistent with this opinion and settled Florida law regarding the proper deference to be given municipal legislative findings. As there was competent, *670 substantial evidence before the city council supporting its determination of blight, the trial court is directed to validate the bond issue which is the subject of this action.
It is so ordered.
ANSTEAD, C.J., SHAW, WELLS, PARIENTE, and QUINCE, JJ., and HARDING, Senior Justice, concur.
NOTES
[1] As is the situation with many of Florida's coastal communities, Panama City Beach has developed in a linear fashion along the Gulf of Mexico, with Front Beach Road serving as one of the City's major east-west thoroughfares. The other primary east-west roadway is Back Beach Road (U.S. 98).
[2] This Memorandum of Understanding served as the foundational contract between the two entities, detailing their relationship, proposed exchanges of land and services, and various other covenants and obligations. The agreement was amended once, on October 13, 2000.
[3] The same five people composed the city council and the CRA board.
[4] The State Attorney did not contest the validity of the agreement and bonds in its answer. Indeed, throughout the trial court proceedings, as well as in its filings with this Court, the State has asserted that the bonds and interlocal agreement are valid.