992 So.2d 171 (2008)
CITY OF PARKER, etc., et al., Appellants,
v.
STATE of Florida, etc., et al., Appellees.
No. SC07-1400.
Supreme Court of Florida.
September 18, 2008.
*174 Randall W. Hanna, Mark G. Lawson, Theresa B. Proctor, Christopher B. Roe, and Frederick J. Springer of Bryant Miller Olive, P.A., Tallahassee, FL, Michael S. Davis of Bryant Miller Olive, P.A., Tampa, FL, and Timothy J. Sloan of Harmon and Sloan, Panama City, FL, for Appellant.
Terrell K. Arline, Bay County Attorney, Panama City, FL, and William A. Lewis, Chief Assistant State Attorney, Fourteenth Judicial Circuit, Panama City, FL, for Appellees.
PER CURIAM.
We have before us an appeal from a circuit court's final judgment invalidating tax-increment-financed bonds proposed for issuance by City of Parker ("Parker") pursuant to part III of chapter 163, Florida Statutes (2006), referred to as the Community Redevelopment Act.[1] Partially reversing the circuit court, we validate the proposed bonds.

I. FACTUAL AND PROCEDURAL BACKGROUND
On December 18, 2006, Parker adopted Resolution 06-254. This resolution identified the Parker redevelopment area, stated that the area contains blighted conditions, and included a finding of a need for a community redevelopment agency. Then, on December 19, 2006, Parker adopted Ordinance 06-311, Resolution 06-255, and Ordinance 06-312. Ordinance 06-311 established the City of Parker Community Redevelopment Agency, while Resolution 06-255 approved the redevelopment plan for the area, finding the redevelopment plan in conformity with Parker's comprehensive plan. Ordinance 06-312 created the Community Redevelopment Trust Fund and authorized the use of tax increment financing to fund the trust, stating that "[t]here shall be paid into the Fund each year by each of the `taxing authorities'... a sum equal to ninety-five percent (95%) of the incremental increase in ad valorem taxes levied each year by that taxing authority." Parker, Fla., Ordinance 06-312, § 4 (Dec. 6, 2006).
On February 8, 2007, Parker enacted Ordinance 07-313 (the bond ordinance). This bond ordinance authorizes Parker to issue bonds not exceeding $40,995,891 for the purpose of financing capital projects identified in the redevelopment area, including "pedestrian, parking and transportation improvements, roadway, access to St. Andrews Bay and East Bay and streetscape and public plaza improvements, electrical utility improvements, water/fire service improvements and wastewater system improvements." Parker, Fla., Ordinance 07-313, art. I, § 1.01 (Feb. 8, 2007).
Absent Parker's approval of supplemental ordinances, the tax increment revenues deposited into the trust fund are the only source of revenues pledged to repay the bonds. See Ordinance 07-313, art. I, § 1.01.[2] However, the bond ordinance emphasizes that government taxing power is not pledged. Specifically, section 4.01 provides that the bonds are not "general obligations or indebtedness of [Parker] as `bonds' within the meaning of any constitutional *175 or statutory provision." Ordinance 07-313, art. IV, § 4.01. Rather, the bonds are special obligations "payable solely from and secured by a lien upon and pledge of the Pledged Funds." Id. Section 4.01 then explains that no bondholder "shall ever have the right to compel the exercise of the ad valorem taxing power of the State, Bay County, or any other governmental entity." Id.
After receiving notice of Parker's intention to issue the bonds, Bay County filed for declaratory and injunctive relief seeking to enjoin Parker from enforcing its CRA resolutions and ordinances. Thereafter, Parker filed a complaint seeking validation of the bond issuance. The circuit court subsequently consolidated the declaratory action into the validation proceeding and accepted Bay County's pleading in the declaratory action as the County's answer to the validation complaint. In the validation proceeding, the State required strict proof of the matters alleged but did not otherwise object.
After conducting a hearing as well as viewing the redevelopment area, the circuit court entered the final judgment denying validation of the bond issuance. The circuit court concluded that the bonds could not be validated as a matter of law because Parker does not levy ad valorem taxes. The trial court found that "[r]eading all of the provisions of Chapter 163, Part III, Florida Statutes (The Community Redevelopment Act) together, in pari materia, supports the conclusion that a municipality must itself levy ad valorem taxes before it may utilize [tax increment financing] to fund bonds for a CRA." However, the circuit court found without merit Bay County's challenges to Parker's finding of blight, to Parker's finding of conformity, and to the constitutionality of tax increment financing.

II. DISCUSSION
Parker appeals the circuit court's conclusion that Parker cannot issue these tax-increment-financed bonds because Parker does not levy ad valorem taxes. On cross-appeal, Bay County contests the circuit court's conclusions regarding Parker's finding of blight, Parker's finding that the redevelopment plan conforms with the comprehensive plan, and the constitutionality of tax increment financing without a referendum.
A trial court must make three determinations during a bond validation proceeding: (1) whether the public body has the authority to issue the subject bonds; (2) whether the purpose of the obligation is legal; and (3) whether the authorization of the obligation complies with the requirements of law. City of Gainesville v. State, 863 So.2d 138, 143 (Fla.2003). On appeal, this Court reviews the "trial court's findings of fact for substantial competent evidence and its conclusions of law de novo." Id. (citing City of Boca Raton v. State, 595 So.2d 25, 31 (Fla.1992); Panama City Beach Cmty. Redev. Agency v. State, 831 So.2d 662, 665 (Fla.2002)).
As explained below, we reverse the circuit court's conclusion that Parker cannot issue the proposed bonds because Parker does not levy ad valorem taxes. However, we affirm the circuit court's conclusions regarding the finding of blight, the finding of conformity, and the constitutionality of tax increment financing. We address each issue in turn.

A. Parker Does Not Levy Ad Valorem Taxes
Parker argues that the plain language of the Community Redevelopment Act does not require it to levy ad valorem taxes in order to issue the proposed tax-increment-financed bonds. We agree.
*176 "Statutory interpretation is a question of law subject to de novo review." BellSouth Telecomm., Inc. v. Meeks, 863 So.2d 287, 289 (Fla.2003). "When the statute is clear and unambiguous, courts will not look behind the statute's plain language for legislative intent or resort to rules of statutory construction to ascertain intent." Daniels v. Fla. Dep't of Health, 898 So.2d 61, 64 (Fla.2005).
Here, the statute is clear and unambiguous. Section 163.358, Florida Statutes (2006), of the Community Redevelopment Act provides that "[e]ach county and municipality has all powers necessary or convenient to carry out and effectuate the purposes and provisions of this part." (Emphasis added.) One of the "provisions of this part" is section 163.387, Florida Statutes (2006), authorizing the use of tax increment financing to fund community redevelopment. Section 163.358 does not limit the exercise of power to carry out this provision of the Community Redevelopment Act only to those counties and municipalities that levy ad valorem taxes.
In addition to the general statement in section 163.358, the Community Redevelopment Act lists the discrete steps a county or municipality must undertake to employ tax increment financing under the Act, and no step requires that Parker levy ad valorem taxes. Specifically, section 163.356(1), Florida Statutes (2006), provides in part:
Upon a finding of necessity ... and upon a further finding that there is a need for a community redevelopment agency to function in the county or municipality to carry out the community redevelopment purposes of this part, any county or municipality may create a public body corporate and politic to be known as a "community redevelopment agency."
(Emphasis added.) And section 163.387(1)(a) provides:
After approval of a community redevelopment plan, there may be established for each community redevelopment agency ... a redevelopment trust fund. Funds allocated to and deposited into this fund shall be used by the agency to finance or refinance any community redevelopment it undertakes pursuant to the approved community redevelopment plan. No community redevelopment agency may receive or spend any increment revenues pursuant to this section unless and until the governing body has, by ordinance, created the trust fund and provided for the funding of the redevelopment trust fund until the time certain set forth in the community redevelopment plan.... Such ordinance may be adopted only after the governing body has approved a community redevelopment plan. The annual funding of the redevelopment trust fund shall be in an amount not less than that increment in the income, proceeds, revenues, and funds of each taxing authority derived from or held in connection with the undertaking and carrying out of community redevelopment under this part.
Moreover, "governing body" is defined in section 163.340(3), Florida Statutes (2006), as "the council, commission, or other legislative body charged with governing the county or municipality." Finally, "taxing authority" is defined in section 163.340(24) as "a public body that levies or is authorized to levy an ad valorem tax on real property located in a community redevelopment area."
Read together, these sections of the Act explain that a county or municipality must make the requisite findings of necessity and blight, create a community redevelopment agency, adopt a community redevelopment plan, and establish a redevelopment *177 trust fund in order to utilize tax increment financing for community redevelopment. And taxing authorities are required to fund the trust fund. The Act never mentions that the municipality must itself levy ad valorem taxes in order to proceed with any of the steps described above.
The trial court used section 163.387(1)(b) to support its conclusion that Parker must levy taxes to utilize tax increment financing. Section 163.387(1)(b) states:
For any governing body that has not authorized by June 5, 2006, a study to consider whether a finding of necessity resolution ... should be adopted, has not adopted a finding of necessity resolution... by March 31, 2007, has not adopted a community redevelopment plan by June 7, 2007, and was not authorized to exercise community redevelopment powers pursuant to a delegation of authority ... by a county that has adopted a home rule charter, the amount of tax increment to be contributed by any taxing authority shall be limited as follows:
a. If a taxing authority imposes a millage rate that exceeds the millage rate imposed by the governing body that created the trust fund, the amount of tax increment to be contributed by the taxing authority imposing the higher millage rate shall be calculated using the millage rate imposed by the governing body that created the trust fund.
This section, which calls for millage parity between taxing authorities and the governing body that set up the trust fund, would effectively relieve a taxing authority from making increment contributions to the trust fund if the governing body creating the trust fund did not levy ad valorem taxes because the governing body's millage rate would be zero. However, in this case, the parties agree that Parker acted before the above statute would preclude such financing. In other words, Parker met the statutory deadlines listed above. Therefore, section 163.387(1)(b) simply does not apply to this case.
In light of the above, we find that the Community Redevelopment Act does not require Parker to levy ad valorem taxes in order to issue the proposed tax-increment-financed bonds.

B. Blight
On cross-appeal, Bay County argues that the trial court applied an incorrect standard when analyzing Parker's finding of blighted conditions in the redevelopment area.[3] In addition, Bay County *178 argues that this legislative finding is not supported by competent, substantial evidence. We disagree with Bay County.
"Under Florida case law, the trial court [examines] legislative findings to determine whether they [are] `patently erroneous.'" Panama City Beach Comty. Redev. Agency, 831 So.2d at 667. "Indeed, legislative determinations are entitled to a presumption of correctness and should be upheld if supported by competent, substantial evidence in the record." Id. And when reviewing a trial court's final order in a validation proceeding, this Court reviews "the trial court's findings of fact for substantial competent evidence and its conclusions of law de novo." City of Gainesville, 863 So.2d at 143.
Contrary to Bay County's argument, we find that the trial court applied the correct statutory standard for blight when reviewing Parker's legislative finding of blighted conditions. For instance, when discussing Parker's finding of blight, the trial court included the following statement that accurately summarizes the applicable statutory standard:
The evidence presented in this matter supports the correctly articulated City Council findings that (1) there were a substantial number of deteriorated, or deteriorating structures, in which conditions, as indicated by government-maintained statistics or other studies, were leading to economic distress or endangering life or property within the community redevelopment area, and (2) nine of the other fourteen factors in the statutory definition were supported by the evidence before the council members.
The trial court also correctly concluded that there is competent, substantial evidence to support Parker's legislative finding of blight. When adopting Resolution 06-254, Parker had before it a Findings of Necessity Report that listed multiple areas of deterioration in the redevelopment area. The report also contained a windshield survey analysis, which pinpointed locations of deteriorated or deteriorating structures, displayed pictures of those structures, and described the deterioration. Moreover, the Findings of Necessity Report specifically stated that "these deteriorated structures, functions and conditions are such they `are leading to economic distress or endanger life or property.'" Finally, Bay County does not dispute that Parker properly found, based on the Findings of Necessity Study, nine of the fourteen statutory factors in support of blight.
Accordingly, the trial court applied the correct statutory standard in upholding Parker's finding of blight, a legislative *179 finding supported by substantial, competent evidence.

C. Conformity of Redevelopment Plan
Next, Bay County argues that there is no competent, substantial evidence to support Parker's legislative finding that the redevelopment plan conforms to Parker's comprehensive plan. This claim is without merit.
The record contains competent, substantial evidence in support of Parker's finding. Specifically, Parker's comprehensive plan accommodates prospective community redevelopment plans by providing that "[r]edevelopment programs and funding should be explored and a plan established to address the City's redevelopment needs should they occur during the next planning period." Furthermore, the redevelopment plan contains numerous references to the comprehensive plan that demonstrate the planners' conscious effort to conform to the comprehensive plan. Finally, Parker's consultant, the firm that prepared the comprehensive plan, expressed the opinion that Parker's redevelopment plan conforms to Parker's comprehensive plan.
Given the substantial, competent evidence supporting Parker's legislative finding that its redevelopment plan conforms to its comprehensive plan, we affirm the trial court determination on this issue.

D. Constitutionality of Tax Increment Financing
Lastly, Bay County argues that the proposed tax-increment-financed bonds violate the referendum requirement of article VII, section 12 of the Florida Constitution. "The determination of a statute's constitutionality and the interpretation of a constitutional provision are both questions of law reviewed de novo by this Court." Fla. Dep't of Revenue v. City of Gainesville, 918 So.2d 250, 256 (Fla.2005). As explained below, we conclude that the proposed bonds do not violate article VII, section 12.
In State v. Miami Beach Redevelopment Agency, 392 So.2d 875 (Fla.1980), this Court held that it was permissible for a local government to use the tax increment as one of the sources of debt service on outstanding bonds where the taxing power had been disclaimed and no lien could attach until the funds were deposited into the trust account. In other words, we held that tax increment financing does not run afoul of the referendum requirement of article VII, section 12 so long as ad valorem taxing power is not pledged. In so holding, this Court stated the following:
[T]here is nothing in the constitution to prevent a county or city from using ad valorem tax revenues where they are required to compute and set aside a prescribed amount, when available, for a discreet [sic] purpose. The purpose of the constitutional limitation is unaffected by the legal commitment; the taxing power of the governmental units is unimpaired. What is critical to the constitutionality of the bonds is that, after the sale of bonds, a bondholder would have no right, if the redevelopment trust fund were insufficient to meet the bond obligations and the available resources of the county or city were insufficient to allow for the promised contributions, to compel by judicial action the levy of ad valorem taxation. Under the statute authorizing this bond financing the governing bodies are not obliged nor can they be compelled to levy any ad valorem taxes in any year. The only obligation is to appropriate a sum equal to any tax increment generated in a particular year from the ordinary, general levy of ad valorem taxes otherwise made in the city and county that year. Issuance of these bonds without approval of the voters *180 of Dade County and the City of Miami Beach, consequently, does not transgress article VII, section 12.
Id. at 898-99.
In State v. School Board of Sarasota County, 561 So.2d 549 (Fla.1990), this Court reiterated the holding in Miami Beach as follows:
In State v. Miami Beach Redevelopment Agency, 392 So.2d 875 (Fla.1980), we interpreted the words "payable from ad valorem taxation" in article VII, section 12 and held that a referendum is not required when there is no direct pledge of the ad valorem taxing power. We noted that although contributions may come from ad valorem tax revenues: "What is critical to the constitutionality of the bonds is that, after the sale of the bonds, a bondholder would have no right, if [funds] were insufficient to meet the bond obligations ... to compel by judicial action the levy of ad valorem taxation.... [T]he governing bodies are not obliged nor can they be compelled to levy any ad valorem taxes in any year." Id. at 898-99. The agreements here, as in Miami Beach, although supported in part by ad valorem revenues, expressly provide that neither the bondholders nor anyone else can compel use of the ad valorem taxing power to service the bonds.
Id. at 552 (alterations in original); see also Strand v. Escambia County, No. SC06-1894, ___ So.2d ___, 2008 WL 4240151 (Fla. Sept. 18, 2008) (expressly declining to recede from Miami Beach).
In the present case, the proposed bonds conform to the tax increment financing mechanism we approved in Miami Beach. Parker's bond ordinance provides that no bondholder "shall ever have the right to compel the exercise of the ad valorem taxing power of the State, Bay County, or any other governmental entity." Ordinance 07-313, art. IV, § 4.01. The bond ordinance also explains that the bonds are "payable solely from and secured by a lien upon and pledge of the Pledged Funds." Id. Thus, Parker's proposed bonds do not pledge the taxing power of any government entity. The bondholders have no right, if the trust fund were insufficient to meet the bond obligations, to compel the levy of ad valorem taxation. Consequently, the proposed tax-increment-financed bonds are constitutional without a referendum.

III. CONCLUSION
For the foregoing reasons, we direct the circuit court to validate the tax-increment-financed bonds proposed for issuance by Parker pursuant to the Community Redevelopment Act. In so holding, we reverse the circuit court's conclusion that Parker cannot issue the proposed bonds because Parker does not levy ad valorem taxes. However, we affirm the circuit court's judgment in all other respects.
It is so ordered.
WELLS, ANSTEAD, PARIENTE, JJ., and CANTERO, Senior Justice, concur.
BELL, J., concurs in part and dissents in part with an opinion, in which QUINCE, C.J., concurs.
LEWIS, J., dissents with an opinion.
BELL, J., concurring in part and dissenting in part.
I agree with the majority that "the Community Redevelopment Act does not require Parker to levy ad valorem taxes in order to issue the proposed tax-increment-financed bonds." Majority op. at 177. I also agree that Parker's legislative findings of blight and conformity are supported by competent substantial evidence. However, I do not agree that Parker has the authority to issue these tax-increment-financed *181 bonds without first obtaining approval by referendum as required by article VII, section 12 of the Florida Constitution.
As this case makes clear, the "pledge of taxing power only" premise underlying State v. Miami Beach Redevelopment Agency, 392 So.2d 875 (Fla.1980), can be used by local governments to circumvent the constitutional check on long-term debt "payable from ad valorem taxation." Instead of deferring to precedent that vitiates the referendum requirement of article VII, section 12, it is our responsibility to reassess and, if necessary, recede from that precedent. As Justices Scalia and Douglas have acknowledged, "[a] judge looking at a constitutional decision may have compulsions to revere past history and accept what was once written. But he remembers above all else that it is the Constitution which he swore to support and defend, not the gloss which his predecessors may have put on it." Daniel A. Farber, The Rule of Law and the Law of Precedents, 90 Minn. L.Rev. 1173, 1174 (2006) (quoting South Carolina v. Gathers, 490 U.S. 805, 825, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989) (Scalia, J., dissenting) (quoting William O. Douglas, Stare Decisis, 49 Colum. L.Rev. 735, 736 (1949))).
As I explain, the plain meaning and purpose of article VII, section 12 require receding from the premise in Miami Beach that the referendum requirement is limited to the pledge of ad valorem taxing power. I would hold that the phrase "payable from ad valorem taxation" in article VII, section 12 refers not only to a pledge of the taxing power itself but also to a pledge of ad valorem tax revenues. And, because tax increment financing pledges funds obtained from ad valorem tax revenues, bonds that rely upon such financing schemes are bonds "payable from ad valorem taxation." Consequently, approval of such bonds by referendum, as mandated by article VII, section 12, must be obtained.
I begin by setting forth the constitutional provision at issue, by describing tax increment financing, and by outlining our decision in Miami Beach. I then state my concern regarding the "pledge of taxing power only" premise underlying Miami Beach. Having explained my concern, I reassess the premise in three steps. First, to provide context, I explore the history of Florida's constitutional restrictions on local borrowing. Second, I analyze the plain language of article VII, section 12. Third, having determined that the "pledge of taxing power only" premise is invalid, I explain why receding from Miami Beach comports with this Court's stare decisis jurisprudence.

A. Article VII, Section 12, Tax Increment Financing, and Miami Beach

At the outset, it is helpful to set forth the text of the constitutional provision at issue, to provide a concise description of tax increment financing, and to describe our Miami Beach decision. Article VII, section 12 of the Florida Constitution is the provision at issue. It dictates that:
Counties, school districts, municipalities, special districts and local governmental bodies with taxing powers may issue bonds, certificates of indebtedness or any form of tax anticipation certificates, payable from ad valorem taxation and maturing more than twelve months after issuance only:
(a) to finance or refinance capital projects authorized by law and only when approved by vote of the electors who are owners of freeholds therein not wholly exempt from taxation; or
(b) to refund outstanding bonds and interest and redemption premium thereon *182 at a lower net average interest cost rate.
(Emphasis added.)
Tax increment financing is concisely described as follows:
[Tax increment financing] utilizes the incremental increase in ad valorem tax revenue within a designated geographic area to finance redevelopment projects within that area. As property values in an area rise above an established aggregate valuation (often described as the "frozen" tax base), tax increment is generated by applying the millage rate to that increase in value and depositing in a trust fund an amount equal to such increased tax revenue. This trust fund is the source for repayment of indebtedness. In some states the deposit is made by the tax collector directly to the trust fund. In Florida, however, ad valorem taxes are collected by the tax collector in each county, remitted to the local governments, and then appropriations of the tax increment are made by "taxing authorities." Those appropriations may be made from any source available to the local government, but they must be in an amount equal to the ad valorem tax revenue increase in the redevelopment area.
David E. Cardwell & Harold R. Bucholtz, Tax-Exempt Redevelopment Financing in Florida, 20 Stetson L.Rev. 667, 668-69 (1991) (footnotes omitted).
In Miami Beach, we held that it was permissible for a local government, without approval by referendum, to pledge tax increment revenues as a source of debt service on bonds for capital projects if the taxing power was not pledged and the lien on the funds did not attach until they were deposited into a trust account.[4] This holding was based upon the premise that the phrase "payable from ad valorem taxation," as used in article VII, section 12, refers only to the pledge of taxing power. No explanation was given as to how this premise or the holding comported with the plain language of article VII, section 12.[5] Moreover, no historical support was provided to show how the purpose of the referendum requirement was unaffected by such financing.

B. The Concern
Parker's tax increment financing scheme is certainly consistent with the premise underlying Miami Beach. However, a comparison of Parkers scheme with the scheme in Miami Beach raises serious concerns regarding the validity of the premise that the phrase "payable from ad *183 valorem taxation" refers only to a pledge of taxing power, not to a pledge of ad valorem tax revenues. In other words, what may have been opaque in Miami Beach is undeniably clear in this case.
Miami Beach involved the financing of a redevelopment of a distinct blighted area in the south end of the city. 392 So.2d at 882. The localities in Miami Beach not only pledged tax increment revenues to service the bond debt but also pledged sales, lease, and use fee revenues from the newly redeveloped properties. Id. at 898. Thus, it could reasonably be said that the tax increment was simply a measure of one of the revenue sources pledged to service the bond debt. See id.
In contrast, Parker plans to finance capital projects in a redevelopment area that is composed of 505 acres or approximately fifty percent of Parker's total area. And unlike Miami Beach, the primary funding to service the bonds is purely ad valorem tax revenues. As the majority acknowledges, "[a]bsent Parker's approval of supplemental ordinances, the tax increment revenues deposited into the trust fund are the only sources of revenues pledged to repay the bonds." Majority op. at 174. In effect, Parker wants to pledge revenue from ad valorem taxation as the primary source of funding capital projects in half of its city limits without the consent of the electorate. Therefore, the tax increment in this case is not simply the measurement of the payments that would service the bond debt. It also represents the primary, and potentially only, source of repayment.
Approving Parker's scheme without a referendum vitiates the critical check on local governments incurring long-term debt. It abrogates the referendum requirement of article VII, section 12 for long-term debt by rendering meaningless the phrase "payable from ad valorem taxation." It also appears that such a result vitiates the purpose of this constitutional restraint on the power of local governments to incur long-term debt.
Given the concerns raised by Parker's use of the "pledge of taxing power only" premise, it is this Court's duty to reassess this premise. In other words, we should reconsider Miami Beach's premise that the "payable from ad valorem taxation" language in article VII, section 12 is limited to the pledging of ad valorem taxing power. The first step in this reassessment is to understand the history of Florida's constitutional restrictions on local borrowing.

C. Reassessing the Pledging of Taxing Powers Only Premise

1. The History of Constitutional Restrictions on Local Borrowing

While the Florida Constitution of 1885 restricted the ability of the Legislature to authorize state bonds,[6] prior to 1930 there was no express constitutional restriction on local borrowing. Rather, the power of a local government to borrow was restricted primarily by the rule that local bodies had no power except those delegated to it by the Legislature. Amos v. Mathews, 99 Fla. 1, 126 So. 308, 320 (Fla.1930) ("It is fundamentally true that all local powers must have their origin in a grant by the state which is the fountain and source of authority."). Consequently, in early local borrowing cases, this Court was typically *184 concerned with whether the Legislature had the power to authorize local governments to borrow. See Joseph W. Little, The Historical Development of Constitutional Restraints on the Power of Florida Governmental Bodies to Borrow Money, 20 Stetson L.Rev. 647, 661 (1991).
In 1930, the Florida Constitution was amended and the following provision expressly requiring a referendum for local bonds was added to article IX, section 6:
[T]he Counties, Districts or Municipalities of the State of Florida shall have power to issue bonds only after the same shall have been approved by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such Counties, Districts, or Municipalities shall participate....
This Court explained the societal conditions that led to the adoption of this amendment as follows:
Many of us lived through the times immediately prior to the adoption of the amended Section 6 of Article IX of the State Constitution, and are thoroughly familiar with the conditions and the history of the times which resulted in a demand on the part of the people for this amendment.
Hundreds of millions of dollars in bonds had been issued by municipalities and counties throughout the state. These bonds were issued pursuant to hundreds of special acts of the Legislature. These acts were passed by the Legislature as local bills and without the approval of anyone except the delegation in the Legislature from the county affected. Under these various acts, ad valorem taxes were levied and the future credit of the governmental unit pledged without the approving voice of the freeholders or the people who had to pay the taxes. Most of these bonds were issued during the period known as the "Boom Days." The "Boom" bursta depression was on and the people and the freeholders found themselves saddled with debts impossible for them to pay. Millions of these bonds sold for less than 20% of par and some of them for less than 10% of par. Defaults multiplied throughout the state. The effect was as could be expected. The people awakened to the fact not only that an intolerable burden had been placed upon them far beyond their ability to pay, but also that the very welfare of the State was threatened, because of the weakened credit structure. Indeed, such was the impact that even the Congress of the United States took cognizance of the financial condition of Florida municipalities and amended the Federal Bankruptcy Act, 11 U.S.C.A. § 1 et seq., so as to bring bankrupt municipalities within its terms. Many Florida cities and towns took advantage of this amended act.
It was during such times and under these conditions that the Legislature of 1929, in response to the demands of the people, adopted the proposal to amend Section 6 of Article IX of the Constitution. In the ensuing general election the proposed amendment was adopted.
State v. Fla. State Improvement Comm'n, 60 So.2d 747, 751 (Fla.1952).[7] Thus, the *185 purpose of the 1930 amendment was to impose a restriction on local borrowing and a restraint on "the spendthrift tendencies of political subdivisions to load the future with obligations to pay for things the present desires, but cannot justly pay for as they go." Leon County v. State, 122 Fla. 505, 165 So. 666, 669 (1936).
Despite this acknowledged purpose of the amendment, this Court held that the 1930 referendum requirement did not apply to certain forms of local obligations, which were not, in fact, bonds. Posey v. Wakulla County, 148 Fla. 115, 3 So.2d 799 (1941); State ex rel. Houston v. Hillsborough County, 136 Fla. 503, 183 So. 157 (1938); Tapers v. Pichard, 124 Fla. 549, 169 So. 39 (1936). This Court explained its distinction between bonds and other obligations as follows:
As a general rule, we have said that if proposed certificates are secured by a pledge of ad valorem taxes, they are "bonds" and must be approved by the freeholders as required by Section 6, Article IX of the Florida Constitution, but if they are secured by excise taxes, special assessments or charges against the facility constructed with the net proceeds thereof, they are certificates that do not have to be approved by the freeholders.
Klein v. City of New Smyrna Beach, 152 So.2d 466, 467 (Fla.1963). Cf. Leon County, 165 So. at 667 ("Any contractual device for the present funding of tax revenues... to be raised or made available for reimbursement in future years, contrived to be issued as an enforceable legal security to the obligee ... is ... a `bond.' ..."). This distinction and the consequent limitation on the referendum mandate were addressed two decades later in the constitutional revision process.
When the Florida Constitution was revised substantially in 1968, the referendum requirement was modified to its current form in article VII, section 12. The 1968 revision added the terms "certificates of indebtedness," "any form of tax anticipation certificates," and "payable from ad valorem taxation" to the referendum requirement of 1930. The "certificates of indebtedness" and "any form of tax anticipation certificates" language was seen by some as a rejection of this Court's previous distinctions between bonds and other local obligations. See Miami Beach, 392 So.2d at 895-98; Richard A. Harrison, Comment, The Community Redevelopment Act: A Historical Perspective with Commentary on the 1984 Amendments, 14 Stetson L.Rev. 623, 639 (1985). However, this Court interpreted the new "payable from ad valorem taxation" language as "a ratification of prior judicial interpretation ... that local revenue sources other than ad valorem taxation may be pledged without referendum." Miami Beach, 392 So.2d at 898. Overall, the purpose of the 1968 provision was to provide local governments with the flexibility to meet their expanding capital needs, while at the same time placing a democratic restraint on this flexibility as it relates specifically to ad valorem *186 taxation. Although "[l]ocal government indebtedness in Florida [had] increased sharply from $539,000,000 in 1950 to ... an estimated $2,500,000,000 in 1968," approximately a third of the outstanding indebtedness in 1968 was financed by sources other than ad valorem taxation. Manning J. Dauer, et al., Should Florida Adopt the Proposed 1968 Constitution? An Analysis 32 (Public Administration Clearing House, Univ. of Fla. (1968)). And based upon the new "payable from ad valorem taxation" language, it appears that ad valorem taxation was the primary concern at the time.
With this historical context in mind, I address the second step in the reassessment of the premise in Miami Beach by analyzing the language of article VII, section 12.

2. The Plain Meaning of Article VII, Section 12

The language of article VII, section 12 is plain and unambiguous. As stated previously, article VII, section 12 of the Florida Constitution provides as follows:
Counties, school districts, municipalities, special districts and local governmental bodies with taxing powers may issue bonds, certificates of indebtedness or any form of tax anticipation certificates, payable from ad valorem taxation and maturing more than twelve months after issuance only:
(a) to finance or refinance capital projects authorized by law and only when approved by vote of the electors who are owners of freeholds therein not wholly exempt from taxation; or
(b) to refund outstanding bonds and interest and redemption premium thereon at a lower net average interest cost rate.
(Emphasis added.) Thus, article VII, section 12 plainly authorizes localities to issue long-term bonds "payable from ad valorem taxation" for the purpose of financing capital improvements only when "approved by vote of the electors." In other words, a referendum is required whenever bonds financing capital improvements (1) are payable from ad valorem taxation; and (2) mature more than twelve months after issuance. Specific to the issue here, because the payment is from ad valorem taxation in either case, a referendum is required not only when localities pledge ad valorem taxing power, but also when localities pledge ad valorem tax revenues.
The plain meaning of the phrase "payable from ad valorem taxation" clearly encompasses more than a pledge of the ad valorem taxing power. Indeed, taxation is a generalnot a technicalterm. The term encompasses anything generally related to the collecting of tax revenues. According to Webster's Dictionary, "taxation" refers to "the action of taxing" as well as "an amount assessed or obtained by taxation." Webster's Third New International Dictionary of the English Language Unabridged 2345 (1966).[8] Consequently, "ad valorem taxation" refers to both the action of imposing ad valorem taxes as well as the amount of ad valorem revenues obtained. Thus, under the plain meaning of article VII, section 12, a locality is required to obtain approval by referendum whenever ad valorem tax revenues or ad valorem taxing power are pledged as *187 a payment source for the described indebtedness.
Given the plain, unambiguous meaning of article VII, section 12, a meaning supported by its history and purpose, I find no support for the premise that the "payable from ad valorem taxation" language added in 1968 refers solely to the pledge of ad valorem taxing power. And, as in the prior decisions of this Court, the majority provides no substantive support for this premise. I now address the doctrine of stare decisis, the third and final step in reassessing the premise underlying Miami Beach.

3. Stare Decisis

"This Court adheres to the doctrine of stare decisis," State v. J.P., 907 So.2d 1101, 1108 (Fla.2004), as the doctrine is important in "provid[ing] stability to the law and to the society governed by that law." State v. Gray, 654 So.2d 552, 554 (Fla. 1995). However, as this Court has stated, "[s]tare decisis bends where ... there has been an error in legal analysis." State v. J.P., 907 So.2d at 1109 (citing Gray, 654 So.2d at 554). "Perpetuating an error in legal thinking under the guise of stare decisis serves no one well and only undermines the integrity and credibility of the Court." Smith v. Dep't of Ins., 507 So.2d 1080, 1096 (Fla.1987) (Ehrlich, J., concurring in part, dissenting in part). Moreover, the rationale for stare decisis may be "at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions." Agostini v. Felton, 521 U.S. 203, 235, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). As we stated in Allstate Indemnity Company v. Ruiz, 899 So.2d 1121, 1131 (Fla.2005),
[t]his Court has departed from precedent to correct legally erroneous decisions, see Gray, 654 So.2d at 554, when such departure is "necessary to vindicate other principles of law or to remedy continued injustice," Haag, 591 So.2d at 618, and when an established rule of law has proven unacceptable or unworkable in practice. See Brown v. State, 719 So.2d 882, 890 (Fla.1998) (Wells, J., dissenting).
In North Florida Women's Health & Counseling Services, Inc. v. State, 866 So.2d 612, 637 (Fla.2003), this Court explained that before overruling a prior decision, the Court has "traditionally asked several questions, including the following[:]"
(1) Has the prior decision proved unworkable due to reliance on an impractical legal "fiction"? (2) Can the rule of law announced in the decision be reversed without serious injustice to those who have relied on it and without serious disruption in the stability of the law? and (3) have the factual premises underlying the decision changed so drastically as to leave the decision's central holdings utterly without legal justification?
I believe that the answers to all three of these questions weigh in favor of receding from Miami Beach.
First, reliance on the legal fiction that the phrase "ad valorem taxation" in article VII, section 12 only refers to a pledge of ad valorem taxing power has proven unworkable and unacceptable. As this case demonstrates, the legal fiction enunciated in Miami Beach allows localities to pledge ad valorem revenues as the primary and potentially sole method of bond service. Such a result wholly vitiates a critical restraint on the power of local governments to incur long-term debt, a restraint clearly born of the chastening experience of the Great Depression.
Second, Miami Beach can be reversed without serious injustice to those who have relied on it. Reversal of Miami Beach is *188 only detrimental to the extent localities rely upon tax increment financing to avoid public approval by referendum. By receding from Miami Beach, all that local governments must do is obtain the people's approval of the financing. Other than the fear that the people may not agree with their representatives' decision to incur such long-term debt payable from ad valorem taxes, these localities have shown no harm. And, frankly, I am more concerned about the dangers of local governments being left unchecked in incurring long-term debt than I am of any burden caused by a referendum. Indeed, this burden is an essential constitutional check on the constant temptation "to load the future with obligations to pay for things the present desires, but cannot justly pay for as they go." Leon County, 165 So. at 669.
Furthermore, a decision receding from Miami Beach would not be retroactive; therefore, existing debt is not an issue. Consequently, the primary reliance interests affected by a decision receding from Miami Beach are localities and developers with capital projects in the pipeline. These capital projects could still use tax-increment-financed bonds. They would simply need a referendum. Or, if a referendum is considered too costly and uncertain, the localities could explore other financing options for these projects, including "bank community development corporations (bank CDCs), U.S. EPA Brownfields Economic Redevelopment Initiative (where there is an actual or perceived contamination and an active potential for redevelopment or reuse), Community Development Block Grant (CDBG) (it awards funding from the Department of Housing and Urban Development), [and] Business Improvement Districts (BIDs) (a form of privatization used on special assessments to enhance the district)." Harry M. Hipler, Tax Increment Financing in Florida: A Tool for Local Government Revitalization, Renewal, and Redevelopment, Fla. B. J., July-Aug.2007, at 66, 71 n. 41.
Finally, as to the third question, I find that the facts have changed to make the continued application of Miami Beach utterly without legal justification. While the constitutional referendum requirement has not been amended since Miami Beach was decided, the "pledge of taxing power only" premise has been applied to the point where it can no longer be reconciled with article VII, section 12. Because this Court's premise in Miami Beach has led to this contravention of the referendum requirement in article VII, section 12, it is this Court's fundamental duty to correct the problem created by its premise.
Given these reasons, receding from Miami Beach comports with this Court's stare decisis jurisprudence, including the three questions delineated in North Florida.

D. Conclusion
As stated earlier, the tax increment financing scheme in this case makes it abundantly clear that the premise underlying Miami Beach is a legal fiction that has been employed to wholly vitiate the referendum requirement of article VII, section 12. And, it is this Court's fundamental duty to correct its own mistakes when it becomes clear that our decisions have led to what is clearly a constitutional violation. As Justice Ehrlich said, "[p]erpetuating an error in legal thinking under the guise of stare decisis serves no one well and only undermines the integrity and credibility of the Court." Smith, 507 So.2d at 1096 (Ehrlich, J., concurring in part, dissenting in part).
As a result, I would recede from Miami Beach and hold that the phrase "payable from ad valorem taxation," as used in article VII, section 12, refers not only to the *189 pledge of a local body's taxing authority but also to the pledge of ad valorem tax revenues. Because, as shown in this case, tax increment financing pledges funds derived from ad valorem tax revenues, bonds that rely upon such financing are bonds "payable from ad valorem taxation." Consequently, when ad valorem tax revenues are so pledged, "the Constitution requires that the people who are to pay the bill should be given an opportunity to approve the debt before it is incurred." State v. Halifax Hospital Dist., 159 So.2d 231, 235 (Fla.1963) (considering the 1930 referendum requirement). Thus, I would hold that approval of the electorate by referendum must be obtained.
Accordingly, I concur in part and dissent in part.
QUINCE, C.J., concurs.
LEWIS, J., dissenting.
Despite the fact that this case involves a redevelopment project under part III of chapter 163, Florida Statutes, as did State v. Miami Beach Redevelopment Agency, 392 So.2d 875 (Fla.1980), the details and nature of this plan are distinguishable, and its financing component thus violates article VII, section 12 of the Florida Constitution,[9] which states in relevant part:
Counties, school districts, municipalities, special districts and local governmental bodies with taxing powers may issue bonds, certificates of indebtedness or any form of tax anticipation certificates, payable from ad valorem taxation and maturing more than twelve months after issuance only:
(a) to finance or refinance capital projects authorized by law and only when approved by vote of the electors who are owners of freeholds therein not wholly exempt from taxation....
(Emphasis supplied.)
I more fully expressed my view of the plain text of this constitutional provision in my dissenting opinion in Strand v. Escambia County, No. SC06-1894, 992 So.2d 150, 2008 WL 4240151 (Fla. Sept. 18, 2008). For purposes of this case, it is enough to emphasize that the ad valorem tax revenue deposited into the city's Community Redevelopment Trust Fund represents the sole revenue stream pledged to repay or "service" the associated bond debt. In contrast, in Miami Beach, ad valorem tax revenue was only a contingent source from which the city planned to service the associated debt if the primary source (i.e., revenue the redevelopment agency received from sales, leases, and charges for the use of the redeveloped property) proved insufficient. See 392 So.2d at 898. This distinction is dispositive because it directly implicates the central premise of our decisions in County of Volusia v. State, 417 So.2d 968, 972 (Fla.1982), and Frankenmuth Mutual Insurance v. Magaha, 769 So.2d 1012, 1023-26 (Fla.2000): The entity of local government may not circumvent the referendum requirement because its financing scheme inevitably requires that it pay for its debt with ad valorem tax revenue. See also Strand v. Escambia County, No. SC06-1894, slip op. 46-47 at (Fla. Sept. 4, 2008) (Lewis, J., dissenting); Miami Beach, 392 So.2d at 894 ("The Court looks at the substance and not the form of the proposed bonds" to determine whether the entity of local government has complied with the Constitution.).
For these reasons and those expressed in my Strand dissent, I join my colleagues in dissenting from the majority's movement *190 away from the text of our state Constitution.
NOTES
[1] We have jurisdiction. See art. V, § 3(b)(2), Fla. Const.
[2] Specifically, the bond ordinance defines "Pledged Revenues" as follows:

"Pledged Revenues" shall mean, initially, the Redevelopment Trust Fund Revenues and if and to the extent that the Issuer shall so provide by Supplemental Ordinance, (i) any Assessments that may be levied, or (ii) other legally available revenues of the Issuer if consented to by the Holders of the Bonds or the Bond Insurer on their behalf.
Ordinance 07-313, art. I, § 1.01.
[3] "Blighted area" is defined by section 163.340(8) as

an area in which there are a substantial number of deteriorated, or deteriorating structures, in which conditions, as indicated by government-maintained statistics or other studies, are leading to economic distress or endanger life or property, and in which two or more of the following factors are present:
(a) Predominance of defective or inadequate street layout, parking facilities, roadways, bridges, or public transportation facilities;
(b) Aggregate assessed values of real property in the area for ad valorem tax purposes have failed to show any appreciable increase over the 5 years prior to the finding of such conditions;
(c) Faulty lot layout in relation to size, adequacy, accessibility, or usefulness;
(d) Unsanitary or unsafe conditions;
(e) Deterioration of site or other improvements;
(f) Inadequate and outdated building density patterns;
(g) Falling lease rates per square foot of office, commercial, or industrial space compared to the remainder of the county or municipality;
(h) Tax or special assessment delinquency exceeding the fair value of the land;
(i) Residential and commercial vacancy rates higher in the area than in the remainder of the county or municipality;
(j) Incidence of crime in the area higher than in the remainder of the county or municipality;
(k) Fire and emergency medical service calls to the area proportionately higher than in the remainder of the county or municipality;
(l) A greater number of violations of the Florida Building Code in the area than the number of violations recorded in the remainder of the county or municipality;
(m) Diversity of ownership or defective or unusual conditions of title which prevent the free alienability of land within the deteriorated or hazardous area; or
(n) Governmentally owned property with adverse environmental conditions caused by a public or private entity.
However, the term "blighted area" also means any area in which at least one of the factors identified in paragraphs (a) through (n) are present and all taxing authorities subject to s. 163.387(2)(a) agree, either by interlocal agreement or agreements with the agency or by resolution, that the area is blighted.
[4] In reaching this conclusion in Miami Beach, the only authority cited was this Court's prior decision in Tucker v. Underdown, 356 So.2d 251 (Fla. 1978). In Tucker, which was not a bond validation case, this Court found that an ad valorem tax levy for solid waste disposal purposes did not violate the covenants of an earlier bond issuance. Tucker, 356 So.2d at 254. However, the challenge to the ad valorem tax levy, as well as this Court's analysis, was based solely upon the language of the covenants of the bond issuance and the authorizing resolution, not article VII, section 12. Id. at 253-54. Furthermore, Tucker specifically noted that when the Brevard County bonds were originally validated in 1972, the trial court "determined that no referendum was required because the issue pledged no ad valorem tax revenues." Id. at 253 n. 9 (emphasis added).
[5] Our later decisions have also failed to explain how the premise underlying Miami Beach comports with the plain meaning and purpose of article VII, section 12. See State v. Inland Prot. Corp., 699 So.2d 1352 (Fla.1997); Penn v. Fla. Def. Fin. & Accounting Serv. Ctr. Auth., 623 So.2d 459 (Fla. 1993); State v. School Bd. of Sarasota County, 561 So.2d 549 (Fla. 1990). As a result, a majority of this Court has never substantively addressed the arguments of this dissent or even the arguments of the dissent in Miami Beach.
[6] Specifically, article IX, section 6 of the Florida Constitution of 1885 provided the following:

The legislature shall have power to provide for issuing State bonds only for the purpose of repelling invasion or suppressing insurrection, or for the purpose of redeeming or refunding bonds already issued, at a lower rate of interest.
[7] During the proceedings of the Florida Constitution Revision Commission in 1966, commission member and former Florida Supreme Court Justice Harold L. Sebring further explained the boom and bust difficulties that existed at the local level before the adoption of the 1930 referendum requirement:

[B]ecause of the fact that Section 6, Article IX, was not in the constitution at the time, the counties, the municipalities, the various tax districts of the state had been free to bond themselves, until at the time of the depression, overnight when this quote $10,000 an acre land reverted back to $5 an acre, the outstanding bond debt of this state was greater than the assessed valuation of the property of the state.
And then it was with all of these outstanding bonds, particularly those for road and bridge purposes, that bondholders began to ask for their payment in respect to past due obligations, and there was nothing with which to pay, because the only resource of a political subdivision, in the last analysis, is its taxing power, and the taxing power was not there to pay off bonds that had been issued under an assessed valuation that, by the crash, was demonstrated to be perhaps 1,000 percent over and above its assessed valuation.
Convention of the Florida Constitution Revision Commission, Transcript of Proceedings 353 (Dec. 5, 1966).
[8] As this Court recognized in Board of Public Instruction v. Union School Furnishing Co., 100 Fla. 326, 129 So. 824, 826 (1930) (quoting In re Advisory Op. to Gov., 94 Fla. 967, 114 So. 850, 855 (1927)), when considering the language of article IX, section 6 of the constitution of 1885, "[t]he spirit as well as the letter of this section should be preserved and given full force and effect. Its purpose should not be defeated or frittered away by any narrow or technical construction."
[9] I do not address the other issues presented in the majority opinion because they are moot in light of the unconstitutional nature of Parker's tax-increment-financing scheme.